## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| GLENN FREEDMAN, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>WEATHERFORD INTERNATIONAL LTD., et al.,<br><br>Defendants. | Case No.  1:12-cv-2121<br><br>Hon. Lewis A. Kaplan<br><br>ECF Case |

## <u>CONSOLIDATED AMENDED CLASS ACTION COMPLAINT</u>

Eric J. Belfi (EB-8895)
Javier J. Bleichmar (JB-0435)
Wilson Meeks (WM-1066)
Danielle Stampley (DS-0824)
LABATON SUCHAROW LLP
140 Broadway
New York, New York  10005
Telephone:  (212) 907-0700
Facsimile:   (212) 818-0477

*Lead Counsel for Lead Plaintiffs and Proposed Lead Counsel for the Putative Class*

**TABLE OF CONTENTS**

I.     NATURE OF THE ACTION ................................................................... 2

II.    JURISDICTION AND VENUE ............................................................... 7

III.   PARTIES ................................................................................................. 8

       A.   Plaintiffs ...................................................................................... 8

       B.   Weatherford ................................................................................. 8

       C.   Individual Defendants .................................................................. 9

IV.    FACTUAL ALLEGATIONS ................................................................. 10

       A.   Relevant Pre-Class Period Events ............................................. 10

            1.   Weatherford's Tax Planning Strategy.............................. 10

            2.   Weatherford Publicly Attributed Significant Savings To Its Tax
                 Planning Strategy ............................................................ 11

            3.   Weatherford's Falsely Reported Tax Expense Was Material And
                 Inflated The Company's Share Price ................................ 12

       B.   Relevant Class Period Events .................................................... 14

            1.   The First Restatement ...................................................... 14

                 (a)   Weatherford Announced The First Restatement
                       On March 1, 2011 ................................................... 14

                 (b)   Weatherford's March 2, 2011 Conference Call......................... 16

                 (c)   Weatherford Issued The First Restatement On March 8, 2011 ............... 18

                 (d)   The First Restatement Eviscerated Most Of Weatherford's Much
                       Touted Tax Savings ................................................. 21

            2.   The Second Restatement.................................................... 22

                 (a)   Taxes Remained A Central Focus After Weatherford Issued The
                       First Restatement And During The Class Period...................... 22

                 (b)   Weatherford Announced The Second Restatement On February 21,
                       2012...................................................................... 23

(c)    The Announcement Of The Second Restatement Caused A Substantial Drop In Weatherford's Stock Price ........................................ 25

(d)    Weatherford Issued The Second Restatement On March 15, 2012 ................................................................ 26

3.    The Third Restatement ....................................................................... 31

(a)    Weatherford Continued To Issue False Financial Statements In Early 2012 ................................................................ 31

(b)    On July 24, 2012, Weatherford Announced The Third Restatement ........................................................... 32

(c)    The Announcement Of The Third Restatement Caused A Substantial Drop In Weatherford's Stock Price ........................................ 34

C.    Defendants Made False And Misleading Statements With Scienter ......................... 34

1.    Defendants Had Motive ..................................................................... 35

(a)    Weatherford Needed To File Financial Statements To Issue Securities And Comply With Its Debt Covenants .................................. 36

(i)    Weatherford Could Not Issue Securities Without Filing Financial Statements ........................................................ 36

(ii)    Weatherford Needed To File Financial Statements to Comply With Its Debt Covenants ................................................. 37

(b)    Weatherford Generated Negative Cash Flow And Could Not Survive Without Issuing Securities Or Access To The Banking Market ................................................................................. 39

(i)    Weatherford's Operations Historically Did Not Generate Sufficient Cash ................................................. 39

(ii)    Weatherford's Liquidity Constraints In 2011 Were Especially Acute ................................................................. 41

(iii)    Weatherford Also Needed Financing To Enable Its Growth Strategy And Remain Competitive With The Larger Industry Players ................................................................. 44

(c)    The Individual Defendants Had A Personal Monetary Incentive To Inflate The Stock Price And Earnings .................................... 46

2.    The Defendants Knew Or Recklessly Disregarded The Truth That The Statements Were False ................................................................. 48

(a) Weatherford's Issuance Of The First Restatement Despite Identifying Material Weaknesses In Internal Controls Raises A Strong Inference Of Scienter ................................................... 48

(b) The Magnitude And Scope Of The First Two Restatements Raise A Strong Inference of Scienter ................................................. 52

(c) Weatherford's Issuance Of The Second Restatement Despite The Massive Effect On The 2011 Bottom Line Raises A Strong Inference of Scienter ................................................... 54

(d) Becnel's Departure Raises A Strong Inference Of Scienter ................... 55

(e) Tax Reporting And The First Restatement Constituted Core Operations During The Class Period ........................................ 56

D. Relevant Generally Accepted Accounting Principles................................. 57

V.  LOSS CAUSATION............................................................................................ 60

A. Weatherford's Corrective Disclosure Of February 21, 2012...................... 61

B. Weatherford's Corrective Disclosure Of July 24, 2012.............................. 62

VI. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS ........... 64

A. False And Misleading Statements Issued In The First Quarter 2011 ......................... 64

    1. The Form 8-K Filed With The SEC On March 1, 2011 Was False And Misleading .............................................................. 64

    2. The Form 10-K Filed With The SEC On March 8, 2011, Which Included The First Restatement, Was False And Misleading........................................... 66

        (a) The Second Restatement Is An Admission That The Financial Results Reported On March 8, 2011 Were False And Misleading.......... 66

        (b) The Announced Third Restatement Is An Admission That The Financial Results Reported On March 8, 2011 Were False And Misleading............................................................................. 69

    3. The Individual Defendants' Certifications That The Financial Results Reported On March 8, 2011 Were True And Accurate Were False And Misleading....................................................................... 69

B. Weatherford's Financial Results For The First Three Quarters Of 2011 Were False and Misleading ......................................................... 70

1.    Weatherford's First Quarter 2011 Financial Results
       Were False And Misleading..............................................................70

2.    Weatherford's Second Quarter 2011 Financial Results
       Were False And Misleading..............................................................72

3.    Weatherford's Third Quarter 2011 Financial Results
       Were False And Misleading..............................................................74

C.    False And Misleading Statements Issued In The First Quarter 2012 ........77

1.    The Form 8-K Filed With The SEC On February 21, 2012 Was False
       And Misleading..................................................................................77

2.    The Form 10-K Filed With The SEC On March 15, 2012, Which
       Included The Second Restatement, Was False And Misleading ......79

D.    Defendants' False And Misleading Statements Concerning The Financial
       Results For The First Quarter 2012 ....................................................80

VII.   CLASS ACTION ALLEGATIONS ......................................................82

VIII.  PRESUMPTION OF RELIANCE..........................................................84

IX.    NO SAFE HARBOR .............................................................................85

X.     CAUSES OF ACTION .........................................................................86

COUNT  I

       FOR VIOLATIONS OF SECTION 10(b) OF THE EXCHANGE ACT AND
       RULE 10b-5 PROMULGATED THEREUNDER AGAINST ALL DEFENDANTS .......86

COUNT  II

       FOR VIOLATIONS OF SECTION 20(a) OF THE EXCHANGE ACT
       AGAINST THE INDIVIDUAL DEFENDANTS .........................................89

XI.    PRAYER FOR RELIEF .......................................................................91

XII.   JURY TRIAL DEMANDED.................................................................92

iv

Co-lead Plaintiffs Anchorage Police & Fire Retirement System ("Anchorage Police & Fire") and Sacramento City Employees' Retirement System ("SCERS" which, together with Anchorage Police & Fire, are referred to throughout as "Lead Plaintiffs"), individually and on behalf of all other persons and entities who purchased or acquired Weatherford International, Ltd. ("Weatherford" or the "Company") common stock in the United States during the period between March 2, 2011 and July 24, 2012, inclusive, (the "Class Period"), and who were damaged thereby, allege the following based upon personal knowledge as to their own acts, and upon information and belief as to all other matters.

Lead Plaintiffs' information and belief is based on Lead Counsel's investigation, which included, among other things, a review and analysis of Weatherford's public filings with the U.S. Securities and Exchange Commission ("SEC") and other public documents pertaining to Weatherford and its senior officers and directors, including its Chief Executive Officer Bernard J. Duroc-Danner ("Duroc-Danner") and its former Chief Financial Officer, Andrew P. Becnel ("Becnel," who together with Duroc-Danner, are referred to as the "Individual Defendants"; the Individual Defendants, together with Weatherford, are referred to as "Defendants"), including press releases, analyst reports, conference calls with analysts, pleadings in other litigations, news articles and other media coverage.  Many of the facts supporting Lead Plaintiffs' allegations are known only by Defendants or are exclusively within their custody and/or control.  Lead Plaintiffs believe that substantial further evidentiary support will be revealed after a reasonable opportunity to obtain discovery.

I.      NATURE OF THE ACTION

1.      This securities class action arises from the admittedly false financial statements issued by Weatherford starting in 2007.  Since then, every single quarterly and annual financial report issued, all 21 of them, inflated Weatherford's earnings by more than $900 million in violation of Generally Accepted Accounting Principles ("GAAP").  Weatherford did this by consistently underreporting taxes, improperly calculating (i) the tax effect of inter company transfers, (ii) reserves for unrecognized tax benefits, (iii) withholding taxes, (iv) valuation allowances on deferred tax assets, and (v) "other adjustments" to current and deferred tax accounts.

2.      As a result of the magnitude and scope of the falsely reported tax liabilities, Weatherford was forced to restate its financial results.  A restatement is a term of art under GAAP.  It is reserved for those situations in which the previously issued financial statements were materially false as of the time of issuance.  In other words, there was no change in circumstances or subsequent event that modified the underlying reasons for which Weatherford underreported taxes.  Rather, Weatherford simply reported false financial results despite having all the correct underlying information at the time it prepared the financial statements.

3.      Critically, Weatherford did not restate just once, but three separate times over the course of eighteen months.  The first restatement marks the beginning of the Class Period, and was announced on March 1, 2011 and issued on March 8, 2011 (the "First Restatement").  It reduced Weatherford's reported earnings from 2007 to 2010 by approximately $500 million – $460 million of which was the result of underreported taxes due to improper reconciliations for intercompany transactions.

4.      Defendants downplayed their intent to defraud by feigning incompetence and blaming a "material weakness in the Company's internal control over financial reporting for

2

income taxes," according to the Form 8-K filed with the SEC on March 1, 2011.  In subsequent conference calls with Wall Street analysts, Defendants further claimed that the tax reporting "process" was flawed and riddled with procedural and administrative defects.  The tax areas subject to misreporting included current taxes payable, deferred tax assets and liabilities, reserves for uncertain tax positions, and current and deferred income tax expense.  Nevertheless, Defendants issued the First Restatement and the then-current financial statements on March 8th, just a few days after discovering these problems.

5.      Defendants had a strong and clear motive to issue the First Restatement instead of foregoing the filing of any financial statements for a period of time.  The Company was highly leveraged and had more than $6.5 billion in bonds outstanding and a credit facility of $1.75 billion.  The covenants regulating that debt required that Weatherford issue financial statements in a timely fashion.  A violation of those covenants constituted an event of default.  In addition, because of the Company's heavy debt burden, access to the capital markets to fund its negative operating cash flow after capital expenditures was critical.  Federal securities regulations, however, preclude the public issuance of securities if an issuer has not timely filed its financial statements with the SEC.  Accordingly, Weatherford could not afford **not** to timely file its financial statements with the SEC in March 2011.

6.      Throughout 2011, Weatherford continued to timely report earnings and file its financial statements.  In doing so, it provided assurances that its financial statements were true, accurate, and in compliance with GAAP, despite the fact that it had admittedly not resolved the material weakness in internal controls.  For example, the Company's Form 10-Q for the quarterly period ended September 30, 2011, said:

> In light of th[e] material weakness, in preparing our condensed
> consolidated financial statements included in this Quarterly Report

3

on Form 10-Q, **we performed additional reconciliations and other post-closing procedures to ensure our condensed consolidated financial statements have been prepared in accordance with U.S. generally accepted accounting principles**. (emphasis supplied).

7.     The import of this statement for the putative Class, Wall Street, and the market at large, was unequivocal.  Weatherford was going out of its way to induce putative Class members to rely on its financial statements and ring fence the outstanding and unresolved material weakness in internal controls, so it would not impact the Company's ability to issue financial statements in conformity with GAAP.  Wall Street analysts took notice.  Societe Generale issued a report on October 25, 2011, entitled, "WFT Q3 2011 – Two Down, Is Three In The Cards?"  The title alluded to the fact that, after the debacle of the First Restatement announced in the First Quarter of 2011, in the prior two quarters (the Second and Third Quarters of 2011) the Company had reported positive results:  "Weatherford (WFT) reported Q3 2011 adjusted net income of $197 million – very much in line with the consensus number of $200 million and at the upper end of the company's guidance – marking the second quarter in a row that the company has met or exceeded expectations."

8.     But just like Weatherford's financial results of 2007 through 2010 were a mirage, so were those reported in 2011.  On February 21, 2012, the Company announced yet another restatement, which it formally issued on March 15, 2012 (the "Second Restatement").  The Second Restatement not only restated 2011 financial results, but also re-restated Weatherford's 2007 through 2010 financial statements.  In other words, the Second Restatement restated the First Restatement thereby admitting that the First Restatement had been false and misleading.

9.     The Second Restatement, like the first one, was also massive, reaching approximately $375 million.  It reduced earnings by "roughly $225 million to $250 million of aggregate net adjustments to previously reported financial results for the years 2010 and prior."

In addition, it wiped out over $118 million in earnings in 2011 – or approximately 50%. Reported taxes increased by approximately 80% compared to previously issued reports for 2011.

10.     The Second Restatement again related to the Company's accounting for income taxes and to virtually the same areas identified previously in the First Restatement: "current taxes payable, certain deferred tax assets and liabilities, reserves for uncertain tax positions, and current and deferred income tax expense."

11.     Once again the Company issued the Second Restatement on March 15, 2012, less than a month after the announcement on February 21, 2012, instead of foregoing issuing financial statements for some time.  Within three weeks, on April 4, 2012, Weatherford issued $1.3 billion in Senior Notes.  This public offering would have been impossible had the Company not issued the Second Restatement and filed its financial statements with the SEC on March 15, 2012.  The issuance of $1.3 billion in debt came on the heels of further indebtedness incurred by the Company.  In 2011, Weatherford had issued $1.1 billion in new debt, mostly in the form of short-term commercial paper.  The proceeds from the long-term Senior Notes were largely used to pay down short-term debt and fund the Company's negative cash flow.

12.     Shortly after this $1.3 billion public offering, on July 24, 2012, Weatherford once again announced a restatement (the "Third Restatement"), marking the end of the Class Period. Defendants had managed to perfectly shoehorn the debt offering in the one quarter between the Second Restatement and the announcement of the third.  The Third Restatement admitted that the Second Restatement had been false and misleading and that $92 million in reported earnings, and possibly another $15 million, for a total of about $107 million, were false.  Taxes had again been underreported.  This time Weatherford did not issue the Third Restatement and for the first time did not file its financial statements with the SEC.  The Company announced that it would

endeavor to file before the next deadline of November 9, 2012, but could make no assurances. To date, Weatherford has not issued the Third Restatement.  Tellingly, Defendant Becnel had left the Company as a result of the Second Restatement on March 31, 2012, and for the first time was not at the helm and able to force a premature filing.

13.     The aftermath of the three restatements has been disastrous for Weatherford.  Not only have over $900 million in false profits been wiped out, but the Company's core financial strategy launched in 2007 has now been shown to be nothing more than a sleight of hand trick. Back in 2007, Weatherford embarked in a sophisticated tax strategy with much fanfare.  It announced an ambitious plan to reduce taxes and ultimately re-domesticated its headquarters to Switzerland, even though its operations are based in Houston.  The Company reported an effective tax-rate reduction from 26% in 2006 to 6.5% in 2009.  Lower taxes were at the core of Weatherford's profitability strategy, with Wall Street analysts constantly following the effective tax rate and its effect on earnings.  Each percentage point reduction in the effective tax rate was extremely lucrative and translated into $0.02 to $0.03 in earnings per share.  But as a result of the three restatements, Weatherford's tax rate is now back to normal and in the high 30%s.  As Wall Street analyst Joe Hill concluded in the earnings conference call on February 21, 2012:  "I hate to beat a horse that is looking pretty dead here, but the tax guidance for '12 essentially implies zero benefit for the redomestication in Switzerland . . . . essentially you look like you have a US tax rate right now."

14.     Indeed, once the Company's true underlying financial profile had been revealed, Weatherford's enterprise value and stock price were cut dramatically.  Weatherford's stock traded at a Class Period high of approximately $23.50 per share in March 2011.  The market capitalization of the Company reached over $17.5 billion.  At the end of the Class Period, the

stock traded at about $12.40 per share, and has remained at roughly that level ever since. Weatherford's market capitalization is now about $9.5 billion.  This is consistent with the reduction in earnings of about 50% in 2011 caused by the Second Restatement.  Simply put, Defendants had improperly doubled the value of the Company through accounting chicanery, severely damaging investors and the putative Class.

## II.   JURISDICTION AND VENUE

15.     Lead Plaintiffs assert claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and the rules and regulations promulgated thereunder, including SEC Rule 10b-5, 17 C.F.R. § 240.10b-5 ("Rule 10b-5").

16.     This Court has jurisdiction over the subject matter of this action under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331, because this is a civil action arising under the laws of the United States.

17.     Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b), (c), and (d).  Many of the acts and transactions that constitute the alleged violations of law, including the dissemination to the public of untrue statements of material facts, occurred in this District.

18.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mail, interstate telephone communications and the facilities of national securities exchanges.

### III.   PARTIES

#### A.   Plaintiffs

19.     Co-Lead Plaintiff Anchorage Police & Fire is a public pension fund in Anchorage, Alaska, and operates for the exclusive benefit of policemen and firemen and certain other employees of the municipality of Anchorage.  Anchorage Police & Fire serves approximately 800 beneficiaries and has over $322 million in assets under management.  As reflected in the certification attached hereto as Exhibit 1, Anchorage Police & Fire purchased or acquired shares of common stock of Weatherford during the Class Period, and suffered damages as a result of the violations of the federal securities laws alleged herein.

20.     Co-lead Plaintiff SCERS is a public pension fund that provides retirement benefits for public employees of the municipality of Sacramento, California.  SCERS serves approximately 1,400 beneficiaries and manages assets totaling over $302 million.  As reflected in the certification attached hereto as Exhibit 2, SCERS purchased or acquired shares of common stock of Weatherford during the Class Period, and suffered damages as a result of the violations of the federal securities laws alleged herein.

#### B.   Weatherford

21.     Defendant Weatherford is one of the largest global providers of products and services for the oil and gas industry, including the drilling, evaluation, completion, and production of oil and natural gas wells, employing over 58,000 people in more than 100 countries.  Weatherford reported $13 billion in revenues and $278 million in net income for 2011 before the Third Restatement.

22.     Until 2009, Weatherford was incorporated in Bermuda.  In 2009, Weatherford re-domesticated to Switzerland and established its legal domicile at 4-6 Rue Jean-François Bartholoni, 1204 Geneva, Switzerland.  The Company's operational headquarters, however, are

located in Houston, Texas.  Weatherford's stock is traded primarily on the New York Stock Exchange ("NYSE"), although it also trades in the SIX Swiss Exchange and EuroNext markets, under the symbol "WFT."

### C.    Individual Defendants

23.    Duroc-Danner founded EVI, Inc. ("EVI"), Weatherford's predecessor company, in May 1987 and was elected President and Chief Executive Officer in 1990.  Subsequent to the merger of EVI with Weatherford Enterra, Inc. in 1998, Duroc-Danner continued to act as President and CEO and was elected Chairman of the Board.  He held these positions throughout the Class Period.  Duroc-Danner knowingly or recklessly signed, and made false and misleading statements in each of Weatherford's admittedly false SEC filings during the Class Period, including those related to Weatherford's $500 million First Restatement, Weatherford's $375 million Second Restatement, and Weatherford's pending $92 million Third Restatement.

24.    Becnel was appointed Senior Vice President and Chief Financial Officer of Weatherford in October 2006.  Becnel joined the Company in 2002 and served as Corporate Vice President of Finance from September 2005 to October 2006, Vice President of Finance from May 2004 to September 2005, and Associate General Counsel from June 2002 to May 2004.  Becnel knowingly or recklessly signed and made false and misleading statements in Weatherford's admittedly false SEC filings during the Class Period, including those related to Weatherford's $500 million First Restatement, Weatherford's $375 million Second Restatement, and Weatherford's pending $92 million Third Restatement.  Weatherford announced on March 23, 2012 (only eight days after the Second Restatement) that Becnel would leave Weatherford effective March 31, 2012.

IV.     FACTUAL ALLEGATIONS

    A.     Relevant Pre-Class Period Events

        1.     Weatherford's Tax Planning Strategy

25.     Beginning in 2007, Defendants continuously promoted a purportedly sophisticated "tax planning" strategy, which included the creation of substantial deferred tax assets and re-domestication of the Company to Switzerland in 2009.  The purpose of this strategy was for Weatherford to differentiate itself from its competitors in the oil services sector, where it has generally been viewed as a junior player to Halliburton, Schlumberger and Baker Hughes. Over time, Weatherford falsely claimed that this strategy saved the Company hundreds of millions of dollars in taxes, significantly increasing earnings per share and net income and inflating Weatherford's share price.

26.     According to Weatherford, its tax planning strategy lowered the Company's effective tax rate from 26% in 2006, to 23% in 2007, 14.8% in 2008, 6.5% in 2009, and approximately 17% in 2010.[1]  In comparison, Weatherford's competitors during that time claimed average tax rates of approximately 30%.  These purported tax savings were at the core of the Company's earnings strategy and repeatedly was the focus of Weatherford's top management, including the Individual Defendants, as well as investors and Wall Street analysts.

27.     Unbeknownst to investors, however, these tax savings were the result of accounting chicanery and, ultimately, not real.  Weatherford would subsequently restate hundreds of millions of dollars in tax accounting related items and revise its tax rate to reach well into the 30% levels matching those of its competitors.  Once Weatherford's tax strategy was

---

[1] This approximated 2010 effective tax rate is the non-GAAP rate reported by Duroc-Danner and Becnel to analysts on Weatherford's earnings conference calls in 2010.  The effective tax rate excludes one-time charges reflected in Weatherford's GAAP tax rate for 2010 and presumably seeks to better reflect the Company's recurrent earnings from operations.

debunked, its stock price adjusted to remove the inflation, causing millions of dollars in damages to investors and the Class.

> ### 2. Weatherford Publicly Attributed Significant Savings To Its Tax Planning Strategy

28.     Weatherford touted its tax planning strategy to investors for years before the Class Period.  For example, in the First Quarter 2007 earnings conference call on April 25, 2007, Becnel attributed an important decrease in the effective tax rate from 27% to 24% to "good work from our tax group in terms of planning."  Becnel further explained that the Company "had some benefits that rolled in. . . that [Weatherford] will recognize over the rest of the year in terms of those planning implementations."  Becnel thus credited Weatherford's lower effective tax rate to its tax "planning," and especially emphasized the Company's accumulation of deferred tax assets.

29.     Similarly, during the Fourth Quarter 2007 investor conference call on January 25, 2008, Becnel again highlighted the Company's lower projected effective tax rate of 22%, and added:  "on the taxes, remember that those are a function of two things:  Your geographic earnings mix, as well as multiple structures that you have in place in order to be able to be efficient with respect to taxes.  At certain times, and the[s]e are not always convenient, those structures may mature, and the benefit may mature under it.  And it is at that time that you are required to take the benefit."  Becnel thus showed that he was heavily involved in the Company's tax strategy.

30.     Likewise, on Weatherford's 2008 Form 10-K filed with the SEC, the Company represented that "[t]he decrease in our effective tax rate during 2008 and 2007 as compared to 2007 and 2006, respectively, was due to benefits realized from the refinement of our international tax structure and changes in our geographic earnings mix.  During 2008, we

recorded a benefit of approximately $100 million related to foreign taxes paid that will be used to reduce our future United States tax liability."  The reported tax rate in 2008, prior to the First Restatement, was approximately 15%.  Once again Weatherford had attributed its rapidly decreasing tax rate to the Company's "geographic mix" and refined "tax structure."  The Company repeated this statement each year thereafter until the First Restatement in 2011.

31.     The focus on tax planning continued on Weatherford's investor conference calls in 2009.  When asked by an analyst on the First Quarter 2009 earnings call on April 20, 2009 to explain the abnormally low effective tax rates, both Duroc-Danner and Becnel stated:  "That we can answer."  Becnel then explained, "[i]f you look at [the] distribution of earnings by geographic segment and the different rates[,] both what I would call the statutory rates versus effective rates[,] that we have been able to achieve and incremental tax planning that we undertook during the quarter in connection with our move to Geneva, all of those helped."

32.     Then, during Weatherford's investor conference call to discuss the Fourth Quarter 2009 earnings on January 26, 2010, Becnel added, "Q4 saw the end of a one-year tax reorganization, completing our move to a Swiss-based multinational structure.  We should be set with long-term stability."  Defendants then continued to insist throughout 2010 that Weatherford had a lower tax rate than its competitors, attributing those savings to its purportedly beneficial tax structure.  In sum, the Company's tax strategy was at the forefront of its overall business strategy and was carefully monitored, reviewed, and prepared by Defendants Duroc-Danner and Becnel.

### 3.     Weatherford's Falsely Reported Tax Expense Was Material And Inflated The Company's Share Price

33.     Based on Weatherford's improper tax accounting, the Company's earnings per share, return on equity, and return on assets, all increased consistently and significantly before

and during the Class Period.  Each percentage point reduction in the effective tax rate was extremely lucrative to Weatherford's bottom line and translated into $0.02 to $0.03 in earnings per share.

34.     Wall Street took notice.  On April 25, 2007, Credit Suisse issued a report entitled, "Q107 MWR: Secular Growth At Work," which said that Weatherford had lowered its tax guidance to "24% from 27% previously, which boosted our full-year 2007 EPS estimate by approximately $0.11," "[o]wing to mix and enhanced tax planning strategies."  Similarly, on July 24, 2007, RBC Capital Markets raised its earning estimates for Weatherford and highlighted that those "[h]igher estimates [were] primarily a function of a lower effective tax rate."

35.     Naturally, the Company's stock price reacted positively to the purported financial benefits of Weatherford's tax strategy.  On July 23, 2007, according to J.P. Morgan's report entitled, "Raising Est[imates] on Acquisitions & Lower Tax Rate," Weatherford's stock rallied 3% based on a $0.04 increase to EPS due to a lower tax rate.

36.     The positive reaction to Weatherford's tax strategy continued in the Fourth Quarter of 2007.  After Weatherford's investor call, J.P. Morgan issued a report on January 25, 2008 stating that, "WFT picked up $0.05 from a lower tax rate, about $0.02 of which we can explain by the mix shift in op[erating] inc[ome] (specifically, the US being lower).  WFT has made a concerted effort to reduce net taxes in '07, and look to the conf[erence] call for clarification on where the other $0.03 came from."  The next quarter, RBC Capital Markets issued a report on April 21, 2008 with the headline "WFT Beats Street by a Penny, Outlook Not Likely to Disappoint," which also emphasized that Weatherford's "upside was driven by a lower than expected tax rate."  And after the year-end 2008 investor call, Pritchard Capital Partners

noted in its report dated January 27, 2009, that the Company beat EPS because "favorable taxes were better than expected (+$0.03)."

37.    The market's reliance on Weatherford's false and misleading statements regarding its taxes continued into 2009 and 2010.  On April 20, 2009, an RBC Capital Markets report, "1Q09 $0.02 Below Street; In-line With RBC," noted that the Company's "[t]ax rate was 15.5% vs. our 20% estimate, effectively adding $0.02 [of EPS]."  Similarly, SIG's report dated October 20, 2009 ("Weak 3Q International Growth and Operating Margins Illustrate Challenges to WFT Story") said, "[t]he company reported 3Q09 operating EPS of $0.11 – in-line with our estimate and below the $0.13 consensus estimate; however, results would have been even lower if not for a $0.05 tax benefit."

38.    Finally, on October 19, 2010, Guggenheim Securities highlighted as one of its "[k]ey [p]oints" the Company's "[f]avorable [t]ax [r]ate."  It also commented that Weatherford beat EPS by reporting a "lower tax rate (5% vs. guidance of 19%)."  Also on October 19, 2010, Jeffries & Company, Inc. celebrated the Company's "3Q Beat – [d]riven by better operating income, margins, [and] a lower tax rate."

**B.    Relevant Class Period Events**

**1.    The First Restatement**

**(a)    Weatherford Announced The First Restatement On March 1, 2011**

39.    After the market closed on March 1, 2011, Weatherford announced that it would not timely file its 2010 fiscal year Form 10-K with the SEC, and that investors should no longer rely on the Company's financial statements for the fiscal years 2007 through 2010, which would have to be restated.  In the related 8-K Form filed with the SEC that same day, Weatherford blamed the restatement on "the identification of a material weakness in internal control over

financial reporting for income taxes," and the delay in filing to "the amount of time required to perform additional testing on, and reconciliation of, the tax accounts."  Weatherford described the material weakness as follows:

> The Company's processes, procedures and controls related to financial reporting were not effective to ensure that amounts related to current taxes payable, certain deferred tax assets and liabilities, reserves for uncertain tax positions, the current and deferred income tax expense and related footnote disclosures were accurate.

40.     Weatherford also admitted that, because of this material weakness, its "processes and procedures were not designed to provide for adequate and timely identification and review of various income tax calculations, reconciliations and related supporting documentation required to apply our accounting policies for income taxes in accordance with US GAAP."  The Company then explained that the "principal factors contributing to the material weakness were: 1) inadequate staffing and technical expertise within the company related to taxes, 2) ineffective review and approval practices relating to taxes, 3) inadequate processes to effectively reconcile income tax accounts and 4) inadequate controls over the preparation of quarterly tax provisions."

41.     As a result of these admitted material control deficiencies, Weatherford stated that it had "performed additional testing to determine whether or not the material weakness failed to identify any material errors in our accounting for income taxes."  According to the Company, by that point, it had

> substantially completed the testing procedures . . . . [and] identified errors, the correction of which will be adjustments to our historical financial statements and our 2010 fourth quarter earnings release, totaling approximately $500 million for the periods from 2007 to 2010.  . . . The amount for each year is expected to range from $100 million to $150 million.

15

42.     Weatherford "expect[ed] to complete [the] testing procedures, finalize the restatement of [the] financial statements for 2010 and prior years and file [the] Form 10-K within the time period allowed by Rule 12b-25 (15 days)"; in other words, by March 15, 2011.

#### (b)     Weatherford's March 2, 2011 Conference Call

43.     On March 2, 2011, Weatherford held a conference call with Wall Street analysts to further explain the circumstances surrounding the First Restatement.  After years of touting Weatherford's supposedly sophisticated tax program, Becnel claimed that the material weakness arose from the "the immaturity of the organization dealing with a multinational tax structure." Nevertheless, he insisted that the tax structure was still viable and would continue to provide Weatherford with substantial tax-related benefits.

44.     Similarly, Duroc-Danner explained that, "[w]here we had weaknesses clearly is in the process realm and the planning and the structure were actually probably as good and sophisticated as we would have wanted.  We just didn't know how to run that structure as well as we will learn how to.  That is what is in place for the next 12 to 18 months."  In effect, the Individual Defendants were falsely reassuring the market about the continued benefits of the Company's tax planning strategy and falsely blaming Weatherford's recent disappointing tax rate in the faulty execution of that strategy, suggesting it could be rectified.

45.     Becnel reiterated that the existence of the material weakness "led to the need to perform additional testing on and reconciliation of the tax accounts . . . . to determine whether or not the material weakness failed to identify any material errors in our accounting for income taxes."  This testing would delay the filing of the 10-K.  The extra time to file the 10-K with the SEC was needed, Becnel claimed, to **"mak[e] sure that we have tick and tied everything, make sure that we provided revised schedules that support our conclusions and allowing**

16

**everybody in the process, Weatherford and the outside auditors, the appropriate amount of time to finalize review of those and sign off."**  (Emphasis supplied.)

46.     Becnel insisted, however, that the Company had identified all of the material errors lurking in its books despite the material weakness that Weatherford had discovered:  "we first identified the issue, quantified it, were able to explain it and then the work starts with being able to make sure that we have gotten to the right answer."  "[W]e are, obviously, comfortable enough that we have gotten to the right answer to be able to disclose this in these amounts."

47.     As to the specifics of the First Restatement, Becnel divided the restated $500 million into two categories of so-called "errors."  First, he attributed "approximately $460 million . . . to an error in determining the tax consequences of inter-company amounts over multiple years"; more specifically, "[w]e mistakenly tax-affected certain intercompany amounts and booked a tax asset as a result."  Becnel further explained that this "error manifested itself in 2007 and went undetected in that year and each subsequent year.  As a result, the error repeated itself in each year."  When asked, Becnel elaborated that the "mechanical miscalculation was in accounting for these intercompany amounts that instead of applying the 0% effective rate, if you will, and tax-affecting the payment at that level, it was done at 35%."

48.     Becnel then claimed that the "$500 million . . . [had] no impact on our historical reported cash flow from operations as the reduction in net income is offset equally by a reduction in cash consumed by changes in working capital."  As summarized by the analyst from Credit Suisse with whom both Duroc-Danner and Becnel agreed, "over the period, [Weatherford was] building deferred tax assets, as it turns out inappropriately[.]  So the cash tax portion was appropriate, the book tax accounting was inappropriate."

49.     Importantly, Ole Slorer, the analyst from Morgan Stanley, followed up by asking Becnel "[whether he thought] Weatherford . . . [would] be in breach on any other covenants as a result of this accounting glitch."  Becnel tellingly answered that, "with respect to the covenants in our revolver and our indentures, this event in terms of the write-off of these assets does not put us – does not trigger any covenants in those document[s], and that's it.  **We do need to be sure to file our 10-K before March 15 and at this point, we expect to do so**" (emphasis supplied).  This colloquy revealed (i) Becnel's awareness that Weatherford needed to timely file its financial statements with the SEC to prevent a default, and (ii) that the market understood that a default on Weatherford's debt would have a significant adverse impact on the Company.

### (c)     Weatherford Issued The First Restatement On March 8, 2011

50.     On March 8, 2011, Weatherford filed its Form 10-K with the SEC for the fiscal year ended December 31, 2010, which included the "finalized" restatement following the Company's purportedly extensive testing procedures.  Weatherford restated its results for the annual periods from 2007 through 2009 and the first three quarters of 2010.  The 10-K reiterated identical descriptions of the material weakness announced in the March 1, 2011 Form 8-K, as well as the identical principal factors that contributed to the problem.  Duroc-Danner and Becnel each signed the 10-K, asserting that it contained no material misstatements and complied with GAAP.

51.     The relevant portions of the First Restatement are set forth below:

**First Restatement Issued On March 8, 2011 By Weatherford**
**(Net Income And Income Tax Provision In Millions)**

| | 2007 Filing[2] | 2007 Actual | 2007 Percentage Overstated/ Understated | 2008 Filing | 2008 Actual | 2008 Percentage Overstated/ Understated |
|---|---|---|---|---|---|---|
| Diluted EPS[3] | $1.57 | $1.38 | 14% | $2.01 | $1.80 | 12% |
| Net Income[4] | $1,071 | $962 | 11% | $1,393 | $1,246 | 12% |
| Income Tax Provision | $333 | $487[5] | 32% | $250 | $373 | 33% |

| | 2009 Filing[2] | 2009 Actual | 2009 Percentage Overstated/ Understated | 2010 Filing | 2010 Actual[6] | 2010 Percentage Overstated/ Understated |
|---|---|---|---|---|---|---|
| Diluted EPS[3] | $0.35 | $0.24 | 46% | $0.03 | ($0.15) | 120% |
| Net Income[4] | $254 | $170 | 49% | $25 | ($93) | 127% |
| Income Tax Provision | $19 | $87 | 78% | $172 | $298 | 42% |

52.      As set forth in a letter Weatherford sent to the SEC on March 11, 2011 in response to an inquiry from the agency on March 4, 2011, the timeline of events concerning the First Restatement was the following:

---

[2] The "2007 Filing Diluted EPS" reflects income from continuing operations.

[3] "Actual Diluted EPS" reflects income from continuing operations attributable to Weatherford.

[4] Reflects net income from continuing operations attributable to Weatherford.

[5] Calculated based on Weatherford's report that 2007 income tax expense had been understated by $154 million.

[6] As reported in the January 25, 2011 Form 8-K reporting Fourth Quarter 2010 results.

- On February 15th, Weatherford discovered a broad-based material weakness in its accounting reporting, which:

  (1) related to several categories of accounting items including (a) current taxes payable, (b) certain deferred tax assets and liabilities, (c) reserves for uncertain tax positions, and (d) the current and deferred income tax expense (based on Weatherford's incorporation by reference of Form 10-K filed with the SEC on March 8, 2011), and

  (2) was caused by basic failures in the company's infrastructure such as (a) inadequate staffing and technical expertise, (b) ineffective review and approval practices, (c) inadequate processes to effectively reconcile income tax accounts, and (d) inadequate controls over the preparation of the company's quarterly tax provision. This discovery was not triggered by a change in the company's audit procedures, despite the fact that the problem had admittedly existed for years.

- On February 20th, only five days later, Weatherford discovered a $308 million error relating to deferred tax assets **for which no documentary evidence existed**.

- Over the next eight days, Weatherford discovered an additional $192 million in errors, including $40 million in errors relating to other kinds of deferred tax assets.

- On February 28, 2011, Weatherford notified its audit committee of these errors, which authorized the issuance the next day of the Form 8-K announcing the late filing of the 2010 10-K and the First Restatement.

53.   This response to the SEC shows that Weatherford issued the First Restatement on March 8th, only fifteen days after discovering a $308 million dollar accounting hole on February 20th for which no documentation existed.  The Company thus dedicated less than two weeks to investigating potential additional errors caused by its known internal control problems.  In fact, as stated by Becnel during the March 2nd conference call, by that date, Weatherford had substantially completed the investigation and testing procedures.  Purportedly, only the process of finalizing the financial statements remained.  A mere seven days later, on March 8th, Weatherford filed its Form 10-K, which contained materially the same restated numbers as those reported in the Form 8-K.  Weatherford thus issued the First Restatement and sought to put hundreds of millions of dollars in additional tax expenses and numerous GAAP violations quickly behind it.

**(d)      The First Restatement Eviscerated Most Of Weatherford's Much Touted Tax Savings**

54.      The First Restatement proved that Defendants' pre-Class Period claims relating to Weatherford's effective tax rates were false, despite their repeated assurances that the Company's apparent tax savings were due to a good tax "planning" strategy.  Indeed, together with the Second and Third Restatements, Weatherford ultimately restated roughly $900 million in underreported taxes and false earnings.

55.      Weatherford's effective tax rates were revised dramatically higher after the First Restatement: (i) from 23% to 33%[7] in 2007; 15% to 22 % in 2008; 7% to 31% in 2009; and 17% to 52% in 2010.[8]  Overall Weatherford falsely reported an average tax rate of 21% between 2007 and 2010, when its tax rate actually averaged 34%.  These vast increases erased any and all of the supposed tax benefits Weatherford purported to obtain through its tax planning. Weatherford's true effective tax rates were approximately the same or even substantially higher than those of its main competitors, which averaged about 32%.

56.      In addition, the Company made another critical false representation when it issued the First Restatement.  Weatherford falsely reassured the market that investors could rely on Weatherford's restated financial statements, even though the Company's material weakness had not been resolved, because the Company had presumably extensively tested its financial statements in the related tax areas to ensure their accuracy.  In reality, Weatherford would later admit that **all** of its SEC filings in 2011 and 2012, including the First Restatement, were false and contained material misstatements due to the same tax reporting issues.

---

[7] This 2007 effective tax rate, which reflects the First Restatement, was calculated by adding an additional $154 million to Weatherford's originally reported income tax provision for 2007.

[8] This approximated 2010 effective tax rate is the non-GAAP rate reported by Duroc-Danner and Becnel to analysts on Weatherford's earnings conference calls in 2010 as reflecting the impact of the First Restatement.

2.      **The Second Restatement**

(a)      **Taxes Remained A Central Focus After Weatherford Issued
The First Restatement And During The Class Period**

57.      Defendants continued to tout the benefits of the Company's tax planning
throughout the Class Period, asserting falsely low effective tax rates.  Tax rates remained
material to investors and to the value of Weatherford's shares over this period, in part because
the tax rate continued to have a substantial effect on Weatherford's earnings per share.  For
example, in the First Quarter 2011 conference call, on April 21, 2011, Becnel said:  "[l]ower
minority interest and taxes added $0.02 [to EPS] as the recognition of discrete tax benefits
pushed this quarter's effective tax rate down to 21.4%."  This tax rate was still significantly
lower than the tax rate paid by Weatherford's competitors.

58.      During the Second Quarter 2011 conference call on July 26, 2011, Becnel then
highlighted that "[a]n $8 million improvement in below-the-line costs was offset by an increase
in the effective tax rate, which came in at 27.2%."  On the call, Becnel and the analyst from
Deutsche Bank, Mike Urban, also discussed the potential effects of recent tax increases and
changes in the United Kingdom.

59.      Becnel again focused on taxes in the Third Quarter 2011 conference call on
October 25, 2011:  "[a]n increase in the effective tax rate, which came in at 29.6%, cost $0.01
[EPS] compared to the prior quarter, primarily due to a change in mix where we generated
income."

60.      In further acknowledgement of the focus by analysts and the investing community
on the issue of taxes, Weatherford continued to provide updates concerning the progress of its
supposed internal control remediation program in its public filings.  Importantly, Weatherford
explicitly continued to falsely assure the market that, despite the ongoing material weakness,

investors could still rely upon Weatherford's historic and current tax reporting.  Not only was

each publicly filed document during the Class Period certified as accurate and in conformity with

GAAP, but also, even more specifically, in its Third Quarter 2011 Form 10-Q, Weatherford

stated the following:

> In light of this material weakness, in preparing our condensed
> consolidated financial statements included in this Quarterly Report
> on Form 10-Q, **we performed additional reconciliations and
> other post-closing procedures to ensure that our condensed
> consolidated financial statements have been prepared in
> accordance with U.S. generally accepted accounting principles**.
> (emphasis supplied).

61.     Despite these assurances, and Weatherford's continued insistence that its

quarterly financial statements complied with GAAP, Weatherford in fact issued false financial

statements in 2011 by (i) incorporating false historical tax accounting results for 2007-2010,

which the Company would later restate a second and third time, and (ii) reporting materially

false tax results for the first three quarters of 2011.

### (b)     Weatherford Announced The Second Restatement On February 21, 2012

62.     On February 21, 2012, the Company issued a press release and filed a Form 8-K

with the SEC announcing that it would have to restate the already restated financial statements

issued in the First Restatement.  The Company warned "that investors should no longer rely upon

our previously issued financial statements," and that once again the "company expects to file the

restated financial statements described below due to errors relating to the company's reporting of

the provision for income taxes."

63.     Despite the massive $500 million restated pursuant to the First Restatement the

previous year and Weatherford's assurances that no further restatements were required, the

Company announced **"roughly $225 million to $250 million of aggregate net adjustments to**

**previously reported financial results for the years 2010 and prior."**  The Second Restatement again related to the Company's accounting for income taxes and resulted from the same tax issues that Weatherford had previously identified in its 2010 Form 10-K filed on March 8, 2011: "current taxes payable, certain deferred tax assets and liabilities, reserves for uncertain tax positions, and current and deferred income tax expense."

64.     The announcement of the Second Restatement also revealed that the taxes Weatherford had reported for the first three quarters of 2011 could not be relied upon:  "Until the restatement is completed, the company's estimates of the expected adjustments for 2010 through 2008 and prior years, and the nine months ended September 30, 2011, as well as its expected financial results for 2011, are subject to change."

65.     The Company further warned that the 2011 tax accounts had not been finalized, and although total tax expense for the first nine months of 2011 had previously been reported to be $147 million, Weatherford now estimated the total tax expense for 2011 to be between $490 million and $520 million.  Wall Street analysts understood that the 2011 tax expense had dramatically increased.  J.P. Morgan's February 21, 2012 report said, "2011 income taxes will be $500 million … *double* that in our model."  (ellipsis and italics in original).

66.     Even though the Second Restatement rendered false Weatherford's assurances throughout 2011 that investors could rely on the First Restatement despite the persistence of a material weakness in internal controls, Weatherford, again, provided further assurances to the market that the Second Restatement could be relied upon:  "Based upon additional analysis and other post-closing procedures designed to ensure that the company's consolidated financial statements will be presented in accordance with generally accepted accounting principles, the

company believes the review of the company's historical tax accounts has been comprehensive and that the process undertaken has been thorough."

67.     On the February 21, 2012 conference call, Becnel again insisted that Weatherford's "international tax structure . . . is a good structure."  But "[w]hat hasn't been good about it is our lack of understanding and fully appreciating how that structure performs through different economic cycles, and the sensitivity of our tax expense to how we manage certain costs in that structure, and how we document our tax positions."  In other words, Becnel claimed that, despite booking what Weatherford admitted were hundreds of millions of dollars in unsupported deferred tax assets and, nearly a year after the First Restatement, Weatherford somehow still did not "understand" or "fully appreciate" the performance of its tax structure.

68.     Duroc-Danner concurred.  One year after issuing the First Restatement, Duroc-Danner confirmed Becnel's admission that Weatherford did not previously have adequate knowledge to properly report its tax expense:

> [T]he restatements] ha[ve] always been about taxes and tax accounting.  It's bad enough as it is, but this is nothing more than the second of the last chapter of the dismal event of last February [2011], **except that this one is a studious chapter, if you will, one that has gone through the possible understanding of what we have ... we're reporting something that was wrong, we're also reporting things that were wrong**, **but from a position of knowledge.**  Knowledge on the process and knowledge on the history of what we have, which goes back many, many years actually, and it's only taxes; nothing else (emphasis supplied).

### (c)     The Announcement Of The Second Restatement Caused A Substantial Drop In Weatherford's Stock Price

69.     Weatherford's stock price dropped precipitously on the news of the Second Restatement, plummeting nearly 14% in a single day from $17.79 to $15.36 on February 21, 2012.  Volume was extraordinarily heavy, 62.6 million shares were exchanged compared to average daily volume of 13.1 million, resulting in a market capitalization loss of $1.8 billion.  An

analyst report issued by Jeffries called, "Operations Tracking Better Than Expected But Tax Problems Dominate Discussion," stated, "WFT's inability to remedy these internal tax control issues will be a drag on the stock until the Company can clearly demonstrate that this issue is behind it."

70.     Indeed, after being subject to so many false assurances that the market could rely upon the First Restatement and subsequent financial statements – and specifically that another restatement would not be necessary due to the material weakness – the analysts also called into question the credibility of management.  Luke M. Lemoine, at Capital One Southcoast, Inc. noted on February 21, 2012: "[a]ccounting issues [are] rearing their heads again" and "further restatements impact [Weatherford's] credibility."  Morgan Stanley summed up the market sentiment in its February 21, 2012 report called "Operations – Accounting: 1-0" with the following:  "WFT's tax accounting issues surfaced a year ago and since assumed put to rest; resurfacing of these issues and guidance of a high 35% tax rate for 2012 (cash rate below 30%) were disappointing."

### (d)     Weatherford Issued The Second Restatement On March 15, 2012

71.     Weatherford issued the Second Restatement in its 2011 Form 10-K filed with the SEC on March 15, 2012.  This Form 10-K also included four categories of admissions related to the false statements made in the First Restatement and throughout the Class Period.

72.     First, Weatherford admitted that hundreds of millions of dollars in falsely reported earnings existed in all of its SEC filings during the Class Period and that none of the Class-Period-issued financial statements complied with GAAP.  The false statements stemmed from the same material weakness that Weatherford identified in connection with the First Restatement. More specifically, the Second Restatement corrected false statements in the Company's financial

tax reporting, which caused the company to understate its tax expense by $41 million in 2010,

$50 million in 2009, and by $165 million in 2008 and prior years.  The cumulative effect of these

restatements and the First Restatement are staggering.

**Combined First And Second Restatements –
From 2007 Through 2010
(Net Income And Provision For Income Taxes In Millions)**

| | 2007 Filing[9] | 2007 Actual [10] | 2007 Percentage Overstated/ Understated | 2008 Filing[11] | 2008 Actual | 2008 Percentage Overstated/ Understated |
|---|---|---|---|---|---|---|
| Diluted EPS[11] | $1.57 | $1.33 | 18% | $2.01 | $1.71 | 18% |
| Net Income[12] | $1,071 | $927 | 15% | $1,393 | $1,194 | 17% |
| Income Tax Provision | $333 | $522 | 36% | $250 | $433 | 42% |

| | 2009 Filing | 2009 Actual | 2009 Percentage Overstated/ Understated | 2010 Filing | 2010 Actual | 2010 Percentage Overstated/ Understated |
|---|---|---|---|---|---|---|
| Diluted EPS[12] | $0.35 | $0.17 | 106% | $0.03 | ($0.20) | 115% |
| Net Income[13] | $254 | $124 | 105% | $25 | ($152) | 116% |
| Income Tax Provision | $19 | $137 | 86% | $172 | $339 | 49% |

[9] "2007 Filing Diluted EPS" reflects income from continuing operations.

[10] The Second Restatement did not report the impact on the 2007 income tax provision.  This table reflects a $35 million increase in the 2007 income tax provision based on the Second Restatement's $35 million adjustment to 2007 income from continuing operations attributable to Weatherford.

[11] The Second Restatement ascribed $60 million of the $165 million adjustment for 2008 and prior periods to unrecognized tax benefits; the adjustment to the 2008 income tax provision reflects this amount.

[12] "Actual Diluted EPS" as shown in this table reflects income from continuing operations attributable to Weatherford.

[13] Reflects net income from continuing operations attributable to Weatherford.

28

73.     Second, Weatherford restated its quarterly financial statements for the first three fiscal quarters of 2011 due to the same tax issues, increasing its tax provision over that time by $118 million.

**Restatement Of The First Three Quarters Of 2011**
**Issued As Part Of Second Restatement On March 15, 2012**
**(Net Income And Provision For Income Taxes In millions)**

|  | 2011Q1 Filing | 2011Q1 Actual | 2011Q1 Percentage Overstated/ Understated | 2011Q2 Filing | 2011Q2 Actual | 2011Q2 Percentage Overstated/ Understated |
|---|---|---|---|---|---|---|
| EPS | $0.08 | $0.05 | 60% | $0.15 | $0.10 | 50% |
| Net Income[14] | $59 | $37 | 59% | $110 | $76 | 45% |
| Provision Income Taxes | $19 | $46 | 59% | $46 | $76 | 39% |

|  | 2011Q3 Filing | 2011Q3 Actual | 2011Q3 Percentage Overstated/ Understated |
|---|---|---|---|
| EPS | $0.25 | $0.17 | 47% |
| Net Income[13] | $190 | $130 | 46% |
| Provision Income Taxes | $82 | $143 | 43% |

74.     Third, and critically, Weatherford tacitly admitted in the 2011 Form 10-K filed on March 15, 2012 that it had failed to properly conduct the requisite accounting procedures before issuing the First Restatement.  The Company stated in the Second Restatement that, because it was "unable to remediate" the material weakness it had previously identified ("current taxes

---

[14] Reflects net income attributable to Weatherford.

payable, certain deferred tax assets and liabilities, reserves for unrecognized tax benefits and current and deferred income tax expense"), Weatherford was "required [] to perform additional procedures including reconciliations and analyses designed to ensure that our consolidated financial statements have been prepared in accordance with generally accepted accounting principles."

75.     These additional procedures unearthed hundreds of millions of dollars in falsely reported tax expenses beyond those disclosed in the First Restatement.  Weatherford admitted this when it stated that, "[a]s a result of these procedures, we identified additional errors across multiple jurisdictions.  In the aggregate, these errors resulted in an understatement of income tax expense by $41 million and $50 million compared to previously restated results for 2010 and 2009, respectively.  Errors attributable to 2008 and prior totaled $165 million," for a total in excess of $250 million.

76.     Weatherford, however, had been fully aware of the same unresolved material weakness for over a year, including when it filed the First Restatement with the SEC on March 8, 2011.  Accordingly, by stating that it performed those procedures simply because the material weakness in its internal controls was unresolved, Weatherford acknowledged that it should have conducted those same procedures before issuing the First Restatement.

77.     Fourth, because of the nature of Weatherford's statements and the size of the Second Restatement, Weatherford disclosed that the "Department of Justice [is] investigating the circumstances surrounding the material weaknesses in the Company's internal controls over financial reporting for income taxes that was disclosed on Forms 8-K on March 1, 2011 and February 21, 2012 and the related restatements of historical financial statements."

78.     As a further repercussion of the Second Restatement, on March 23, 2012, the
Company announced that Weatherford's CFO, Becnel, and the Vice President of Tax, James
Hudgins, were leaving the Company.  John Briscoe, who had joined Weatherford in August 2011
as Vice President and Chief Accounting Officer, replaced Becnel.  Becnel and Hudgins' ousters
came only one week after the filing of the Second Restatement on March 15, 2012.  As stated in
a March 26, 2012 report by a Morningstar analyst, the "resignations were overdue, particularly
as Weatherford was forced to issue late 10-Ks for two consecutive years . . . . Eventually, the tax
errors totaled almost $750 million over 2007-10 and made it difficult for Weatherford to claim
any incremental tax savings from its move to Switzerland."

79.     Despite the enormous size of the Second Restatement, Weatherford's continued
and vehement assertions that this time it had properly and adequately tested the financial
statements in compliance with GAAP, and the insistence that this time it got it right, the Second
Restatement would not be the last one.  The financial statements as restated in the Second
Restatement would again prove to be false and misleading in that they contained still more
materially false statements stemming from the same tax issues the Company discovered more
than a year before.

### 3.     The Third Restatement

#### (a)     Weatherford Continued To Issue False Financial Statements In Early 2012

80.     Only two months after issuing the Second Restatement, on May 8, 2012,
Weatherford issued its First Quarter 2012 Form 10-Q reporting its quarterly results for the period
ended March 31, 2012.  It included a $36 million allegedly "immaterial" charge tied to historic
accounting for taxes "related to prior periods."  Weatherford admitted that this stemmed from the
same tax-related issues that had caused the First and Second Restatements, which by then had

lingered for well over a year, and that the adjustment again specifically concerned "unrecognized tax benefits."

81.     The May 8, 2012 Form 10-Q also misleadingly reassured the public that Defendants had taken extra steps to overcome whatever material weakness existed to comply with GAAP:

> In light of this material weakness, in preparing our condensed consolidated financial statements as of and for the quarter ended March 31, 2012, we performed additional procedures including reconciliations and analyses designed to ensure that our condensed consolidated financial statements included in this Quarterly Report on Form 10-Q for the quarter ended March 31, 2012 have been prepared in accordance with generally accepted accounting principles.

### (b)     On July 24, 2012, Weatherford Announced The Third Restatement

82.     Yet, just over two months later, after the market closed on July 24, 2012, Weatherford announced another impending restatement.  Weatherford attributed it to the same recurring tax-related problems – current taxes payable, certain deferred tax assets and liabilities, reserves for uncertain tax positions, and current and deferred income tax expense – and stated, once again, that the public could no longer rely upon the Company's previously issued financial statements.

83.     Weatherford further explained that the $36 million "immaterial" tax increase reported in the First Quarter of 2012 Form 10-Q was really a part of a much larger problem, including:  (1) an additional $41 million of tax expense primarily related to accruals for uncertain tax positions that related to prior year operating results, and (2) an approximately $20 million difference between actual tax paid and tax liabilities accrued for prior periods.  "The aggregate $92 million of prior period expenses identified in the first two quarters of 2012 include $34 million in 2011; $22 million in 2010; $20 million in 2009 and $16 million in 2008 and before."

84.     The Company also identified additional issues related to the accounting for income taxes in prior periods that "could result in further adjustments of up to $15 million."  For the first time, however, Weatherford announced that, given its ongoing review of the tax reporting deficiencies, it would not issue restated financial statements for the year ended December 31, 2011, the quarter ended March 31, 2012, or file its financial statements for the quarter ended June 30, 2012, until at least November 2012.

85.     During the related conference call, on July 25, 2012, after management's lengthy discussion of the announced Third Restatement, an analyst expressed surprise at the tax guidance provided, 38%, which he noted was "basically in line with a peer US company."  The analyst asked "are you having to basically wipe the slate clean with the international substructure and rebuild?"  Briscoe could not refute the implication and answered:

> Well, I don't want to say wipe the slate clean, because that is not a true characterization.  But when we went through the restatement last year, we did learn a lot of things that are causing our rate to be higher.  Some of this is through some withholding taxes that, based on how things were structured and how things were being executed, it was triggering additional withholding taxes in jurisdictions where we in some cases may generate low income, or it may even be a deemed profit jurisdiction.  So that is having a negative impact on our overall rate and makes it appear that we are at a US rate.  So withholding taxes is an issue that we are going to focus on.

86.     Thus, after all this time and three restatements, Weatherford admitted that its purported tax savings, and its tax planning, had provided no benefit.  There simply had been no basis for the benefits that Weatherford had knowingly and/or recklessly falsely reported during the Class Period.

**(c)**      **The Announcement Of The Third Restatement Caused A
Substantial Drop In Weatherford's Stock Price**

87.      On July 24, 2012, in reaction to Weatherford's announced Third Restatement, J.P.

Morgan issued an alert entitled, "This Is Beginning to Become Taxing," which stated:  "The

bottom line is we don't know what the bottom line is this or even the last 10 [quarters]."

88.      On July, 25, 2012, the first trading day after the announcement of the Third

Restatement, Weatherford's stock price fell from $12.80 per share at the close of the previous

day's trading to $11.67 per share, or 8.80%, erasing more than $850 million in market

capitalization.  Volume was extraordinarily high with almost 33 million shares traded compared

to the average daily volume of approximately 13.1 million.

89.      That same day, Sterne Agree issued a report called, "Tax Issues Mask Progress,"

which noted "surprise[] [that Weatherford] announced that it had uncovered additional

restatements."  Also on July 25th, Wells Fargo Securities "[l]ower[ed] [its] 2012/2013

[e]stimates [a]nd [v]aluation [a]fter [s]light [o]perational . . . [m]iss [a]nd [a]nother [r]ound [o]f

[t]ax [p]roblem [d]iscoveries."  It also that "[f]ar more discouraging" than the Company's slight

earnings per share performance "was WFT's report that they again found discrepancies in their

quarterly tax provision process despite prior claims that the issues had been successfully

remediated."

**C.      Defendants Made False And Misleading Statements With Scienter**

90.      Numerous facts alleged in this Complaint establish that Defendants' false and

misleading statements were intentional and/or reckless, including the following:  (1) the fraud

was both massive and lengthy, wiping out approximately 50% of the Company's net income and

EPS during the Class Period and spanning more than five years when considering that the

restatements reached back to 2007; (2) the Company had identified a broad and continuing

34

material weakness in the internal controls in its tax reporting processes at the beginning of the Class Period; (3) the First Restatement was huge, over $500 million, and Weatherford completed the investigation within merely two weeks after the tax failures were first identified; (4) the Second Restatement again was massive, approximately $375 million, and again was issued a few weeks after the issues were first identified; (5) the Company had motive to issue the Restatements in order to make certain that it could file its financial statements with the SEC in a timely manner to ensure access to the capital markets, which it desperately needed because in 2010 and 2011 the Company had negative operating cash flow after capital expenditures of approximately one billion dollars; (6) the failure to timely file financial statements constituted a breach of the Company's debt covenants and, thus, an event of default; (7) Becnel left the Company immediately after Weatherford issued the Second Restatement; (8) although quickly after Becnel left, the Company announced the Third Restatement, the Company did not issue the now-announced, but still pending, Third Restatement; (9) the Individual Defendants had a personal monetary incentive to inflate the Company's earnings and stock price; (10) the Second Restatement is an admission that the First Restatement was false and misleading; (11) the Third Restatement is an admission that the First and Second Restatements were false and misleading; (12) Weatherford's tax reporting was effectively a core operation; and (13) the three Restatements, by definition, establish that the Company issued financial statements in violation of GAAP.  Most of these facts are discussed in more detail below.

### 1.     Defendants Had Motive

91.     Defendants had motive to issue the Company's false financial statements. Weatherford was a highly leveraged company with negative operational cash flow after capital expenditures and, therefore, depended on continued access to the capital and banking markets during the Class Period.  As a result of this need for liquidity, Weatherford **had** to file its

financial statements with the SEC.  Otherwise, the Company would have run afoul of the federal

securities regulations and been prohibited from issuing securities, thus, depriving the Company

of much needed cash to fund its operations.  Weatherford's failure to timely file financial

statements also would have placed Weatherford in default of its loan covenants, as well as the

indentures governing the Company's $6.5 billion in outstanding Senior Notes as of December

31, 2010.  Default would have irreparably harmed not only Weatherford's share price but also

the Company's ability to continue as a going concern.

> **(a)** **Weatherford Needed To File Financial Statements To Issue Securities And Comply With Its Debt Covenants**

> **(i)** **Weatherford Could Not Issue Securities Without Filing Financial Statements**

92.     The Securities Act of 1933 (the "Securities Act"), 15 U.S.C. § 77a et seq., and the

rules promulgated thereunder, require that public securities be issued pursuant to a registration

statement.  During the Class Period, Weatherford issued securities – including a $1.3 billion

bond offering – pursuant to Form S-3 "shelf registration statement."

93.     To file a valid Form S-3, the issuer must "ha[ve] been subject to the requirements

of Section 12 or 15(d) of the Exchange Act for a period of at least twelve calendar months

immediately preceding the filing of the registration statement," and "ha[ve] filed in a timely

manner all reports required to be filed during the twelve calendar months and any portion of a

month immediately preceding the filing of the registration statement."  *See* 17 C.F.R. §

239.13(a)(3) (Form S-3 requirements).  The "reports required" refers to Forms 8-K, 10-K and

10-Q, among others.

94.     If an issuer like Weatherford cannot file timely reports, it must file the reports

within the deadlines prescribed under Exchange Act Rule 12b-25.  *See id.*  Under SEC Rules, if

the late filing is an annual report, then the issuer has 15 days to file; if the late filing is a quarterly

report, then the issuer has 5 days to file.  *See* R. 12b-25(b)(2)(ii).  Weatherford therefore had to issue and file the restatements within these time constraints, or it would have been ineligible to file the shelf registration statement or any other type of registration statement.[15]

**(ii)   Weatherford Needed To File Financial Statements to Comply With Its Debt Covenants**

95.     The covenants relating to the Company's publicly issued securities and bank loans, including the revolving credit facility with J.P. Morgan Chase Bank, N.A. as administrative agent (the "Credit Facility"), required that Weatherford timely file financial statements with the SEC.  A failure to do so would have constituted an act of default that the Company could not afford.

96.     As of December 31, 2010, Weatherford had over $6.5 billion outstanding in long-term debt, mainly in the form of Senior Notes maturing between 2011 and 2040.  In 2011, long-term debt was minimally reduced from $6.5 billion to $6.3 billion, but only because $300 million was shifted to current debt outstanding.  Weatherford had issued its Senior Notes pursuant to two separate indenture agreements, one first issued on October 1, 2003, and the other on June 18, 2007.  For all material purposes here, both indentures, as amended from time to time, were identical  (the "Indenture Agreements").  Section 7.4 of the Indenture Agreements required Weatherford to file with the indenture trustee all filings required by the Exchange Act within 15 days after the filing deadline.  Failure to comply with this covenant constituted an event of default pursuant to Section 5.1.

---

[15] Weatherford would have been ineligible to issue securities pursuant to any registration statement because to file a Form S-1 (the only alternative registration mechanism) Weatherford would still have been required to issue truthful and accurate financial statements certified by an independent public accountant.  See 15 U.S.C.A. § 77aa(25), aa(26); see also 15 U.S.C.A. § 77g.

97.     Weatherford also had the Credit Facility, which it increased in 2011 from $1.75 billion to $2.25 billion.  The Company used the Credit Facility to support its $1.5 billion commercial paper program.  Although there were no amounts outstanding on the Credit Facility or commercial paper program as of the end of 2010, Weatherford issued about $1.0 billion in commercial paper in 2011, all of which remained outstanding at year end.

98.     The credit agreement governing the Credit Facility (the "Credit Agreement"), dated October 15, 2010, also stipulated an event of default if Weatherford (a) failed to issue and file its financial statements, or (b) provided materially inaccurate financial information to the lenders.  More specifically, the relevant covenants and provisions required that Weatherford warrant that all information provided to the lenders, including information "in the filings made by [Weatherford] with the SEC pursuant to the Exchange Act" be true and correct.  (Credit Agreement § 6.06).  Weatherford could cure a breach of this provision if it filed a restatement. Because Weatherford executed the Credit Agreement on October 15, 2010, all its financial statements filed with the SEC, at least as of 2007 through the date of execution of the Credit Agreement in 2010, were false and in breach of this Section of the Credit Agreement.

99.     Moreover, Weatherford undertook as an affirmative covenant under Section 7.01 of the Credit Agreement to provide the lenders with the Forms 10-Q and 10-K within 45 days after the end of each quarter and 90 days after the end of each year, respectively.  Failure to comply with this covenant constituted an event of default pursuant to Section 9.01.[16]

100.     Accordingly, Weatherford had $6.5 billion and $7.6 billion in debt as of year-end 2010 and 2011, respectively, subject to default if Weatherford failed to timely file its financial statements with the SEC.  As a result, Weatherford issued the Restatements knowing, or with

---

[16] The July 13, 2011 amendment to the Credit Agreement did not alter the provisions at issue here.

reckless disregard for the fact, that additional false and misleading financial results were forthcoming.

101.    Investors understood the critical nature of Weatherford's ability to timely make SEC filings.  For example, on March 3, 2011, just after the First Restatement was announced on March 1st, but before the First Restatement was issued on March 8th, Moody's warned that Weatherford's failure to timely file financial statements would violate the Company's financial reporting covenants under the Credit Agreement and Indenture Agreements:

> WFT expects to file its 10-K within the 15 day extension period ending March 16, 2011.  If the company is unable to file by March 16, 2011, it will be in violation of the financial reporting covenants under its bond indentures and an official 90 day cure period will begin, during which time the company must either file its 10-K or obtain a waiver to extend the filing date.  If the company cannot file within the cure period, the indenture trustees will have the option to accelerate the obligations at the end of the 90 day cure period.  Under WFT's revolving credit facility, the company has 90 days to file its 10-K after the fiscal year ends and then a 30 day grace period.

102.    Wells Fargo also focused on the importance for Weatherford of filing the Form 10-K in order to not run afoul of the debt covenants.  In a March 8, 2011 report, Wells Fargo said: "**We Are Including Low Risk Of Debt Covenant Issues**.  WFT expects to have its 10-K filed comfortably before the March 15 deadline its creditors require, which we think should be a positive for the stock."  (emphasis in original).

### (b)    Weatherford Generated Negative Cash Flow And Could Not Survive Without Issuing Securities Or Access To The Banking Market

#### (i)    Weatherford's Operations Historically Did Not Generate Sufficient Cash

103.    Beginning in 2007 and through the end of the Class Period, Weatherford's contractual and financing obligations, including its obligations to repay its maturing debt, greatly

exceeded its ability to generate cash.  The cash generated from business operations was vastly insufficient to fund Weatherford's costs related to, among other things, its capital expenditures in property, plants, and equipment, as well as acquisitions.  Accordingly, Weatherford could not operate without issuing debt.

104.    Weatherford's heavy reliance on debt was a concern for Wall Street.  A Morningstar analyst report dated August 1, 2011, and entitled "Credit Analysis," said: "Weatherford has spent significantly in excess of its operating cash flow during the last few years to take advantage of growth opportunities and has used debt to make up the difference." The report noted that "to avoid financial difficulties in the future," the Company would "need to be far more prudent with its expenditures."

105.    A chart showing Weatherford's historical negative free cash flow, and dependence on its ability to continuously issue debt before the Class Period, is clearly set forth in a Morgan Stanley analyst report dated February 23, 2011.  The relevant line items of that chart are set forth below:

### Weatherford Cash Flow Statement
### (in millions)

|  | 2006 | 2007 | 2008 | 2009 | 2010 |
|---|---|---|---|---|---|
| Cash Flow From Operations | $1,087 | $883 | $1,111 | $651 | $825 |
| Capital Expenditures | ($1,071) | ($1,635) | ($2,484) | ($1,569) | ($976.5) |
| Free Cash Flow | $15.9 | ($752) | ($1,373) | ($918) | ($151) |
| Issuance of Debt | $623 | $1,589 | $1,956 | $833.7 | $555.5 |

**(ii)     Weatherford's Liquidity Constraints In 2011 Were
Especially Acute**

106.     At the onset of the Class Period, an analyst report from Wells Fargo dated March

8, 2011, ("WFT:  Upgrading to Outperform After 20% Selloff As Tax Issue Passes, Oil-Driven

Spending Should Drive Valuation") predicted that Weatherford would "need to access the capital

markets again in the next two years to finance growth and repay maturing debt."

107.     Weatherford, indeed, desperately needed financing at the time of the First

Restatement, on March 8, 2011.  By the end of the first quarter of 2011, Weatherford had already

used $173 million in cash for operating activities and $379 million for investment activities, and

made a net repayment of long-term debt of $5 million.  As a result, Weatherford's cash outflow

before financing activities was $552 million.  The Company also had borrowed $385 million in

short-term debt during that same three-month period.  Accordingly, Weatherford's net cash

position had decreased by $167 million.

108.     Weatherford's liquidity condition worsened as the year progressed.  On July 13,

2011, Weatherford sought a longer-term solution to its ongoing liquidity crunch by increasing its

revolving Credit Facility from $1.75 billion to $2.25 billion and extending the maturity from

2013 to 2016.  Pursuant to the agreement, however, Weatherford was required to provide the

administrative agent with current financial statements.  Without current financial statements on

file with the SEC this much-needed increase would have been difficult, if not impossible.

109.     Shortly after Weatherford increased its Credit Facility, on July 27, 2011, an

analyst report from Societe Generale noted that the Company would likely need a long-term

solution to its short-term debt problem, which at that point had grown to $1.1 billion.  Societe

Generale raised the possibility that Weatherford would have to turn to a debt offering later

during the year.

41

110.     By the end of the 2011, Weatherford reported negative operating cash flow after capital expenditures of $841 million,[17] resulting primarily from $1.5 billion in necessary capital expenditures.  To obtain the necessary liquidity, the Company borrowed nearly $1.0 billion in short-term debt under its Credit Facility.  As 2012 approached, however, Weatherford not only would have to repay nearly $1.0 billion in short-term debt but also would have to make a payment of $309 million for the maturity of long-term debt in 2012.

111.     Weatherford was, therefore, in dire need of cash when it issued the Second Restatement on March 15, 2012.  By March 31, 2012, Weatherford had already increased its commercial paper borrowing by another $300 million.  In addition, $273 million of Senior Notes were coming due in June 2012.

112.     On March 30, 2012, Moody's issued a report noting that "[i]n 2012, Moody's expects negative free cash flow for Weatherford primarily because of a high capital budget of just under $2 billion."  The cash drain generated by Weatherford's capital budget was not a matter of choice, but a structural industry necessity.  As Morningstar reported in a report issued on April 10, 2012,

> [t]he capital intensity in the oil services industry is quite high, and Weatherford has outspent its operating cash flow over the past few years building out its international capabilities.  On a net basis, Weatherford raised more than $5 billion in short and long-term debt during 2006-09.  We estimate the firm's total debt/EBITDA ratio at the end of 2012 will be about 2.4 times.  This makes Weatherford one of the oil services industry's most highly leveraged companies.

113.     Accordingly, on April 4, 2012, just after the Company issued the Second Restatement on March 15, 2012, yet before the announcement of the Third Restatement on July

---

[17] Weatherford's 2011 Form 10-K filed on March 15, 2012 reported Net Cash from Operating Activities of $833 million and Net Cash Used by Investing Activities of $1,674.  The difference, $841 million, reflects the Company's negative operating cash flow.

24, 2012, Weatherford completed a securities offering consisting of $750 million in 4.5% Senior Notes due in 2022 and $550 million in 5.95% Senior Notes due in 2042.  The supplemental prospectus filed on March 30, 2012, explained that Weatherford expected to use the funds "to repay existing short-term indebtedness and for general corporate purposes."  Without this infusion of cash, Weatherford could not have met its contractual obligations or repaid its short-term debt.

114.    Weatherford's financial condition, especially its habit of borrowing to stay afloat, drew the attention of the ratings agencies.  On August 21, 2012, after the announcement of the Third Restatement, S&P lowered its outlook on Weatherford, highlighting that the Company had a habit of "continued business investment (capital expenditures, working capital, and acquisitions) in excess of funds from operations that have resulted in debt increasing by an average of $300 million per quarter since mid-2011."

115.    Weatherford's contractual and financial repayment obligations were not the only concerns driving its need to continue to file current financials and maintain its access to the capital markets during the Class Period.  A looming Foreign Corrupt Practices Act ("FCPA") investigation involving the Department of Justice, the SEC and other agencies also presented a liquidity threat.[18]  As J.P. Morgan noted in an analyst report on August 1, 2011: "[a]n adverse ruling [in the FCPA investigation] could lead to a significant fine.  With the company's weak cash flow position, limited cash on hand, and a fully levered balance sheet, an equity issuance could be needed if operating cash flow is not sufficient to pay the fine."

---

[18] Weatherford has been subject to federal investigation since approximately 2006 over three different matters: (i) the Company's participation in the scandal plagued Oil-for-Food program sponsored by the United Nations, (ii) the possible misuse of $175,000 at a European subsidiary for alleged bribes in violation of the FCPA, and (iii) the sales of services in certain sanctioned countries, including Cuba, Iran, Sudan, and Syria.

116.     Because of these significant liquidity issues, only after Weatherford had successfully obtained $1.3 billion in long-term financing through its public debt offering completed on April 4, 2012, did the Company announce the Third Restatement and disclose that it was incapable of issuing truthful financial statements in conformity with GAAP.  With a fully loaded balance sheet, the Company for the first time did not immediately issue the restatement. Instead, Weatherford announced that it would not issue financial statements for a protracted period of time – at least until November 2012.

(iii)     **Weatherford Also Needed Financing To Enable Its Growth Strategy And Remain Competitive With The Larger Industry Players**

117.     Weatherford also needed to access the capital markets to remain competitive and play catch-up because it was the perennial underdog among its industry peers.  Morningstar's equity research described the pressure on Weatherford, especially vis-à-vis its competitors and as a second tier firm, in an April 10, 2012 report, as follows:

> [Weatherford] has followed Schlumberger SLB and Halliburton HAL around the world and has invested billions in intellectual property and acquisitions during the last few years to catch up with its largest competitors …. However, the company still faces barriers to entry in certain markets, where big tenders specify experience and product portfolio requirements that Weatherford cannot yet meet.  Therefore, we think larger competitors are better positioned to capture the best opportunities in the industry[] and[,] forced to compete on price, Weatherford will struggle to deliver shareholder value.

118.     The same report then made clear that Weatherford's ability to compete with the industry leaders hinged on its access to capital and ability to issue securities:  "we do not believe the company will change its growth plans over the next few years, and it will continue to outspend its cash flow in an effort to catch up with its larger competitors."

119.     One way Weatherford sought to catch its competitors was through acquisitions. According to the Morningstar analyst report of April 10, 2012, Weatherford had made more than 250 acquisitions over the years, a strategy that continued in 2011 and 2012.  During the Class Period, the Company made four acquisitions, which it consummated through the issuance of 10.8 million shares valued at $172.6 million.[19]  Without the benefit of the false financial statements filed during the Class Period, Weatherford could not have issued these shares and could not have completed these acquisitions.

120.     The first Class Period acquisition was announced on May 25, 2011, shortly after the First Restatement was filed.  That same day, Weatherford filed a shelf registration statement and a prospectus supplement announcing the registration of 1.6 million shares for purposes of an acquisition.  The name of the target was not disclosed.  Not long after, on June 6, 2011, Weatherford filed another prospectus supplement announcing the registration of another 1.5 million shares for another acquisition – Isotech Laboratories, Inc.  Both the May and June 2011 acquisitions came close on the heels of the filing of the First Restatement in March 2011.

121.     Weatherford continued to file false financial reports during 2011, and, on September 15, 2011, Weatherford filed another supplemental prospectus announcing the acquisition of Global Drilling Corporativo, S.A. d. CV. for 4.6 million shares, valued at $73.5 million.

122.     Lastly, on March 15, 2012, Weatherford filed the Second Restatement, and on May 17, 2012, the Company filed another supplemental prospectus announcing another acquisition.  Weatherford acquired Petrowell, Ltd. for 3.1 million shares valued at $38.9 million.

---

[19] The acquisitions conducted by Weatherford during the Class Period also involved cash consideration of $152 million

123.    Without the benefit of the numerous false financial statements filed during the Class Period, including the First Restatement, the 2011 quarterly reports, the Second Restatement and the First Quarter 2012 quarterly report, Weatherford could not have issued the securities necessary to complete these acquisitions and remain competitive with its peers.

(c)    **The Individual Defendants Had A Personal Monetary
Incentive To Inflate The Stock Price And Earnings**

124.    Weatherford's executive compensation program created a strong personal incentive for the Individual Defendants to inflate Weatherford's stock price and earnings.  In 2009 and early 2010, the Company undertook a review of its executive compensation strategies. As part of this review, it instituted a new incentive award directly linked to the relative performance of the Company's total shareholder return ("TSR") compared to the TSR of its closest competitors: Baker Hughes, Halliburton and Schlumberger.  It defined this group as the TSR Peer Group.

125.    On March 18, 2010, the Company then awarded Duroc-Danner and Becnel 530,035 and 147,232 performance-based restricted share units, respectively.  The restricted shares would only be issued, however, conditioned on the relative performance of Weatherford's TSR compared to the TSR Peer Group.  The Individual Defendants would be issued a number of shares that was directly proportional to Weatherford's TSR Peer Group ranking, as follows:

- First place entitled the Individual Defendants to a "performance multiplier" of 2.0, so that the Individual Defendants would be issued shares equal to twice the number of units awarded.

- Second place entitled the Individual Defendants to a performance multiplier of 1.0,  so that the Individual Defendants would be issued shares equal to the number of units awarded.

- Third place entitled the Individual Defendants to a performance multiplier of 0.5.

- Fourth place entitled the Individual Defendants to a performance multiplier of 0.

126.   On February 15, 2011, the Company made an additional award of 310,427 and 50,906 performance share units to Duroc-Danner and Becnel, respectively.  The shares would be issued based on the same conditions as the 2010 grant, except that the Company slightly modified the multipliers to 2.25, 1.25, 0.5 and 0.  Accordingly, as a result of the TSR Peer Group incentive, the Individual Defendants also had motive to ensure that the Company's total share return exceeded that of its direct competitors.

127.   In February 2011, the Company also instituted an additional compensation plan that further incentivized the Individual Defendants to inflate Weatherford's earnings and stock price.  Pursuant to the "Non-Equity Incentive Compensation Plan," the Individual Defendants were entitled to an additional monetary award calculated as a percentage of their annual salary. The percentage was determined based on the Company's earnings per share as follows:

|  | Threshold EPS $1.00 | Target EPS $1.24 | Superior EPS $1.48 |
|---|---|---|---|
| Duroc-Danner | 40% | 120% | 240% |
| Becnel | 30% | 90% | 180% |

128.   Accordingly, if Weatherford's EPS for 2011 was $1.24, Duroc-Danner and Becnel would have been entitled to an additional cash award equivalent to 120% and 90% of their salaries, respectively.  Critically, EPS was directly affected by the Company's tax expense since by underreporting taxes the Company's EPS would be artificially inflated.

2.      **The Defendants Knew Or Recklessly Disregarded The Truth That The Statements Were False**

(a)     **Weatherford's Issuance Of The First Restatement Despite Identifying Material Weaknesses In Internal Controls Raises A Strong Inference Of Scienter**

129.    Weatherford issued the First Restatement on March 8, 2011, only sixteen days after the Company first discovered on February 20, 2011, a $308 million underreported tax entry for which it had **no documentation**.  During those sixteen days, the Company discovered an additional $200 million in inaccurate tax entries dating back to 2007.  Accordingly, the First Restatement was massive in size and scope.  It totaled approximately $500 million and spanned more than four years and sixteen quarterly reporting periods.

130.    The size and scope of the First Restatement also substantially altered the Company's supposedly successful tax planning story and effectively debunked it.  As Morgan Stanley summarized in a March 2, 2011 report ("Lowering Our Estimates On Upward Tax Rate Adjustment"), "[Weatherford] accounted for ~$700 million in taxes between 2007-2012, which should have been $1.2 billion, and represents 12.5% of cumulative pre-tax income of ~$4 billion over the period.  The historical tax rate should have been ~30% instead of the reported 17.5%."  In effect, taxes were 40% higher in absolute terms between 2007 and 2010, and the tax rate nearly doubled.

131.    At the same time, Weatherford also identified a material weakness in internal controls over financial reporting for income taxes.  The material weakness did not consist of a minor, isolated incident or procedure.  It encompassed the entire tax reporting process and structure.  As the Company admitted in its 2010 Form 10-K filed on March 8, 2011, the "processes, procedures and controls related to financial reporting were not effective to ensure that amounts related to current taxes payable, certain deferred tax assets and liabilities, reserves

for uncertain tax positions, the current and deferred income tax expense and related footnote disclosures were accurate."

132.    The tax processes Weatherford identified as a material weakness had not simply failed because of poor execution.  Weatherford admitted that it had also failed to properly design the tax reporting processes and that no adequate processes had been implemented:  "our processes and procedures were not designed to provide for adequate and timely identification and review of various income tax calculations, reconciliations and related supporting documentation required to apply our accounting policies for income taxes in accordance with U.S. GAAP."

133.    The factors contributing to the material weakness were not limited to one small, easily rectifiable issue.  "The principal factors contributing to the material weakness were: 1) inadequate staffing and technical expertise within the company related to taxes, 2) ineffective review and approval practices relating to taxes, 3) inadequate processes to effectively reconcile income tax accounts and 4) inadequate controls over the preparation of the quarterly tax provision."  In effect, the tax preparation process was woefully incomplete.  The staff was inadequate in terms of size and expertise.  The initial tax preparation controls were inadequate.  And the subsequent reconciliation, review, and approval were ineffective and inadequate.  There is hardly any imaginable part of the tax reporting process that was reliable.

134.    After identifying a massive and broadly based internal control weakness, and finding $500 million in falsely reported tax entries, Weatherford dedicated less than two weeks to investigating its books for related accounting inaccuracies – from February 20, 2011 when it purportedly discovered that it had underreported taxes by hundreds of millions of dollars, to March 2, 2011, when Becnel stated to investors that the inquiry was essentially over.

135.    The supposedly rapid resolution of the tax issue and the expected quick filing of corrected financial statements assuaged the market.  On March 1, 2011, RBC Capital Markets highlighted Weatherford's impending SEC filing in an analyst report entitled, "10-K Filing Delayed":  "The company expects restatements to be finalized and a 10-K to be filed within 15 days."  The next day, March 2nd, after the investor conference call held to discuss the restatement, J.P. Morgan issued a report called "Weatherford International Ltd. – New Set of Problems As Taxes Restated," finding comfort in the quick resolution: "the company is in the final stages of auditing restated results, which will be filed with the SEC within 15 days."

136.    Weatherford thus filed the 2010 Form 10-K with the SEC on March 8, 2011, which included the First Restatement, purportedly in conformity with GAAP.  Duroc-Danner and Becnel both issued the requisite certifications, pursuant to Sections 302 and 906 of the Sarbanes-Oxley Act of 2002, certifying that the financial statements contained therein, including the First Restatement, were true and accurate and complied with the Exchange Act and GAAP.  Defendants thus undertook the issuance of the financial statements and, thereby, represented to the market and investors that, despite the Company's material weakness in internal controls, the First Restatement nonetheless truthfully and accurately reflected Weatherford's financial condition.

137.    Issuing the First Restatement deceived the market, which relied on Defendants' representations and believed that the financial reporting issues had been put to bed.  Wells Fargo issued a report on March 8, 2011, entitled "Upgrading To Outperform After 20% Selloff **As Tax Issue Passes,** Oil-Driven Spending Should Drive Valuation" (emphasis supplied).  It concluded that the "tax issue passed" because of the filing of the Form 10-K and issuance of the First

Restatement: "WFT expects to have its 10-K filed comfortably before the March 15 deadline its creditors require, which we think should be a positive for the stock."

138.    Wells Fargo thus specifically relied on the filing of the Form 10-K with the SEC, and thus the issuance of the First Restatement, to "believe" the "company's account" that the First Restatement was the result of innocuous conduct rather than nefarious intent: "By the company's account, which we believe, the tax errors seem like a simple bust in internal tax accounting models."

139.    Putting aside whether Defendants' conduct before the Class Period was the result of nefarious intent, as of the  beginning of the Class Period, and once Defendants knew of the (i) $500 million First Restatement, (ii) lack of documentation to even justify at least $308 million in tax benefits reported the prior four years, and (iii) massive holes in internal controls, Defendants were, at a minimum, reckless in issuing the First Restatement and representing that the financial statements were then true and accurate.

140.    After the First Restatement, Weatherford continued to mislead investors and reassured them throughout 2011 that despite the material weakness in internal controls, the financial statements the Company continued to issue in 2011 were true and accurate and complied with GAAP.  In the Form 10-Q for the Third Quarter 2011, Weatherford went so far as to emphasize that even though the material weakness in internal controls concerning tax reporting had not been cured, it had taken special measures to ensure that the financial statements were not false:

> In light of this material weakness, in preparing our condensed consolidated financial statements included in this Quarterly Report on Form 10-Q, we performed additional reconciliations and other post-closing procedures to **ensure** our condensed consolidated financial statements have been prepared in accordance with U.S. generally accepted accounting principles.   Accordingly,

> management believes the condensed consolidated financial
> statements included in the Quarterly Report on Form 10-Q fairly
> present, in all material respects, our financial condition, results of
> operations and cash flows as of and for each of the periods
> presented [which included the first nine months of 2011]
> (emphasis supplied).

The Second Restatement issued only a few months later, in March 2012, proved that this statement was false as each of Weatherford's 2011 quarterly statements, and the First Restatement itself, falsely understated taxes by hundreds of millions of dollars, all stemming from the same known deficiencies in tax-reporting that would require restating.

141.    Further, in the Second Restatement, Weatherford tacitly admitted that its testing procedures conducted before the First Restatement, and before filing the Third Quarter 2011 Form 10-Q with the SEC, were inadequate.  The Second Restatement disclosed that, because the Company had been unable to remedy the previously identified weakness in internal controls, it was required to conduct additional testing procedures, which uncovered hundreds of millions in underreported taxes beyond those disclosed in the First Restatement and contained in each 2011 Form 10-Q.  Critically Weatherford had been fully aware of the same unresolved material weaknesses for more than a year, including before it filed the First Restatement with the SEC. Accordingly, the Company should have conducted those same testing procedures before issuing the First Restatement and before Weatherford repeated this failure in connection with each false financial statement Weatherford issued over the Class Period.

### (b)    The Magnitude And Scope Of The First Two Restatements Raise A Strong Inference of Scienter

142.    The magnitude and scope of the first two Restatements, independently and together, raise a strong inference of scienter.  Once the Third Restatement is issued, it will only add to the magnitude and strength of the inference raised.

143.   The First Restatement, as set forth above, was disproportionately large in absolute and relative terms – $500 million in higher taxes representing a tax expense more than 40% greater than initially reported between 2007 and 2010.  In addition, the First Restatement materially altered the profitability thesis trumpeted by Weatherford until then, which had claimed that its tax planning strategy provided the Company a competitive advantage.  The tax rate, which presumably had been approximately 20%, had really been closer to 40% – nearly twice as high.

144.   The Second Restatement was even more substantial in relative terms and had a much larger impact to the bottom line, even if in absolute terms it was smaller than the First Restatement.  In absolute terms, the Second Restatement totaled $374 million, consisting of $256 million re-restating the First Restatement and $118 million restating for the first time the first three quarters of 2011.  In relative terms, it wiped out more than 50% of previously reported earnings for 2011, as follows:

**Restatement Of The First Three Quarters Of 2011**
**Issued As Part Of Second Restatement On March 15, 2012**
**(In Millions)**

|  | Previously Reported Results For First Three Quarters 2011 | Restated Results For First Three Quarters of 2011 | Overstatement or Understatement Amount/ Percentage |
|---|---|---|---|
| Diluted EPS | $0.48 | $0.32 | $0.16 or 50% |
| Net Income[20] | $360 | $243 | $117 or 48% |
| Provision Income Taxes | $147 | $265 | $118 or 80% |

---

[20] Net income attributable to Weatherford.

145.    The chart above shows that after March 8, 2011, when Weatherford (i) had issued the First Restatement exceeding $500 million, (ii) admitted that the Company's supposed tax planning strategy had been debunked, and (iii) knew that its tax reporting was subject to a material weakness, the Company still continued to issue false and misleading financial statements for 2011 that overstated the bottom line by roughly 50 percent.

146.    The announcement of the Third Restatement revealed that tax expenses had been understated by yet another $92 million, at least, between 2008 and 2011.  Of this amount, $34 million corresponded to 2011, raising the income tax provision for all 2011 to $300 million after taking into account the Second Restatement, from the initially reported amount of $147 million. In other words, after the announcement of the Third Restatement, the tax provision for 2011 had been originally understated by 100% – $300/$147 million.

### (c)    Weatherford's Issuance Of The Second Restatement Despite The Massive Effect On The 2011 Bottom Line Raises A Strong Inference of Scienter

147.    In a telling sign that the haste to issue the First Restatement was not accidental, nor anything other than an extreme departure from the standards of ordinary care, Weatherford also immediately issued the Second Restatement.  The Company announced that it would have to issue the Second Restatement on February 21, 2012.  Less than a month later, on March 15, 2012, it issued the Second Restatement.  Defendants thus sought to close the books and issue the restatement despite the growing evidence that the tax reporting issues had not been resolved.

148.    The First Restatement was largely the result of the tax consequences of intercompany amounts that were inappropriately tax effected over multiple years – $460 million of the roughly $500 million.  The Second Restatement, however, was the result of a plethora of additional tax accounting chicaneries, all of which the Company had already identified in March 2011.  Specifically, the Company had improperly reported (i) current taxes payable, (ii) deferred

tax assets, (iii) deferred tax liabilities, (iv) reserves for unrecognized tax benefits, (v) deferred tax income expense, and (vi) withholding taxes.  There were few, if any, tax categories reported by Weatherford that had not been falsely reported, and each false report inflated, rather than deflated, earnings.

149.    This grab bag of accounting tricks, at a minimum, was a significant red flag to Defendants.  Coupled with the fact that the Second Restatement's effect on the 2011 reported results for Weatherford was to reduce the bottom line by 50%, by far the stronger inference is that Defendants acted with scienter in issuing the Second Restatement.

150.    This was confirmed one quarter later, when Weatherford announced on July 24, 2012, that the Second Restatement was false and misleading and that the Company would have to issue a Third Restatement.  Yet this time, after Weatherford had issued $1.3 billion in debt and consummated several equity based acquisitions, Weatherford did not issue the Third Restatement and appropriately delayed the issuance of the financial statements until it had an adequate amount of time to ensure their accuracy.  It, thus, explicitly informed the market that it would not be able to file its financial statements with the SEC prior to the deadline, August 9, 2012, and that it would endeavor to complete the filings by the next reporting deadline of November 9, 2012, although it could not provide any assurances.

(d)    **Becnel's Departure Raises A Strong Inference Of Scienter**

151.    Only eight days after the Second Restatement, on March 23, 2012, Weatherford announced Becnel's departure.  The Company did not provide an explanation, and the use of the term "departure" in the announcement appears to be purposefully ambiguous.  Becnel may have been fired for cause, forced to resign, or resigned voluntarily.  The form of Becnel's departure was inconsequential to the Company, and to Becnel, because Becnel's employment agreement provided Becnel with the same severance and benefits regardless of the form of termination of

employment.  In any event, there is no question that Becnel's departure was related to, and

prompted by, the Second Restatement.  In fact, Becnel's departure was announced jointly with

the departure of the Vice President for Tax, James Hudgins.  On March 26, 2012, Morningstar

described Becnel's departure as "overdue, particularly as Weatherford was forced to issue late

10-Ks for two consecutive years."

152.    Tellingly, with Becnel no longer at Weatherford, the Company ceased to issue the

restatements.  For the first time when the Company announced the Third Restatement on July 24,

2012, it also announced that it would not file its financial statements with the SEC in Form 10-Q

by the deadline.  The Company also warned that it might not be able to make the filing even by

the next deadline of November 9, 2012.  Instead, the Company would meet the minimum

standard of ordinary care and take sufficient time to prepare its financial statements so that the

financial statements would be truthful and accurate.

### (e)    Tax Reporting And The First Restatement Constituted Core Operations During The Class Period

153.    Weatherford's tax planning constituted one of the cornerstones of its financial

strategy.  As set forth in detail above, beginning in 2007, Weatherford launched a tax strategy

designed to significantly reduce its tax liability.  While it was all a mirage, Weatherford

reportedly lowered its effective tax rate from 26% in 2006 to 6.5% in 2009, before again rising to

about 17% in 2010 – still well below the over 30% paid by the Company's peers.

154.    The Company and Wall Street analysts focused consistently for years on

Weatherford's tax rate, and it was a recurring topic of conversation during the investor

conference calls.  For example, in the earnings call for the First Quarter 2009 on April 20, 2009,

analysts asked about Weatherford's low tax rate.  Becnel responded by crediting "incremental

tax planning [and the re-domestication] to Geneva."  Indeed, the Company's profitability was

significantly dependent on its supposedly low taxes.  This was reflected in a report issued by Jeffries & Company immediately before the commencement of the Class Period, on October 19, 2010, which said:  "3Q Beat – [d]riven by better operating income, margins **[and] a lower tax rate**" (emphasis supplied).

155.    Even if Weatherford's tax strategy was only one of three key pillars to the Company's strategy before 2011, the First Restatement certainly raised the tax issue to the top of Defendants' concerns.  The First Restatement was massive and a huge shock to the Company.  The market capitalization of the Company dropped by $1.8 billion.  Analysts called it "another blemish on Management/Controls," as well as a "black eye."  (Wells Fargo, March 8, 2011).  And the Company's tax rate had to be substantially revised upwards from approximately 20% to over 30%.

156.    As if the First Restatement were not enough, the Company announced that it had a material weakness in internal controls for tax reporting.  Aware that all eyes were focused on future financial statements, the Company announced a remediation plan supposedly aimed at rectifying its tax reporting problems.  The remediation plan sought to redesign the accounting processes, hire additional tax personnel, increase the frequency of the estimation of the tax basis, and implement a quarterly process to address additional issues.  Simply put, from the beginning to the end of the Class Period, the Company's tax reporting was the principal focus and central concern of the Company.  Because Weatherford's tax reporting constituted core operations during the Class Period, together with other factors, this raises a strong inference of scienter.

### D.    Relevant Generally Accepted Accounting Principles

157.    GAAP is recognized by the accounting profession as the set of conventions, rules and procedures necessary to define accepted accounting practices at a particular time.  GAAP is also the official accounting standard required by the SEC for purposes of financial reporting.

Pursuant to SEC Regulation S-X Item 4-01(a)(1) (17 C.F.R. § 210.4-01(a)(1)), financial statements filed with the SEC that are not presented in accordance with GAAP are presumed to be false and misleading.

158.    GAAP consists of a hierarchy of authoritative literature promulgated by the Financial Accounting Standards Board ("FASB") and American Institute of Certified Public Accountants ("AICPA").  The highest authority is the Accounting Standards Codification ("ASC").

159.    The ASC Glossary defines a restatement as "[t]he process of revising previously issued financial statements to reflect the correction of an error in those financial statements." Glossary, ASC 250-10-20.  Under GAAP, a restatement is necessary when "[a]n error in recognition, measurement, presentation, or disclosure in financial statements resulting from mathematical mistakes, mistakes in the application of generally accepted accounting principles (GAAP), or oversight or **misuse** of facts **[] existed at the time the financial statements were prepared**."  Glossary, ASC 250-10-20 (emphasis supplied).  Accordingly, by issuing a restatement, Weatherford admitted that its previously issued financial statements were not issued in compliance with GAAP and contained materially false statements.  The restatements issued by Weatherford, therefore, constitute an admission that the Company's restated results were both material and false when made.

160.    Weatherford's restatements, and thereby admittedly false statements, related to "certain deferred tax assets and liabilities, reserves for uncertain tax positions, [and] current and deferred income tax expense."  GAAP standards for deferred tax asset accounting are set forth in ASC No. 740, "Income Taxes," which "establishes standards of financial accounting and reporting for income taxes."  ASC 740-10-05-1.

161.    Weatherford violated both of GAAP's primary objectives related to accounting for income taxes:  (1) "[t]o recognize the amount of taxes payable or refundable for the current year"; and (2) "[t]o recognize deferred tax liabilities and assets for the future tax consequences of events that have been recognized in an entity's financial statements or tax returns."  See ASC 740-10-10-1, Income Taxes, Objectives.  "A deferred tax liability or asset shall be recognized for the estimated future tax effects attributable to temporary differences and carry forwards."  ASC 740-10-25-2.

162.    A company's restated financial statements are subject to the same general GAAP standards discussed above.  *See generally* ASC 250-10.  Those basic principles of GAAP dictate that a company apprised of facts indicating that its financial statements are unreliable must take measures to ensure that those statements are accurate and free from material uncertainty.

163.    In this instance, Weatherford incorrectly applied a simple GAAP accounting principle, repeated over the course of years, to understate tax expense by 460 million, forcing Weatherford to issue the First Restatement.  By Weatherford's own admission, GAAP did not justify the accumulation of the deferred tax assets related to inter-company transactions that Weatherford restated in the First Restatement.  The underlying principle could not be simpler: "If all subsidiaries that participate in an intercompany transaction are 100 percent owned, the inter-company transaction and unrealized inter-company profit or loss on the transaction are fully eliminated in consolidated statements.  That fundamental idea is followed in practice and under the economic unit, parent company, and proportional consolidation concepts.  There is no theoretical support for any other treatment."  ASC 810-10-45-1, 810-10-45-8, 810-10-45-10; FASB Discussion Memorandum: Consolidation Policy and Procedures, September 10, 1991.

164.    Apprised of information that (1) a simple error repeated for years required the restatement of hundreds of millions of dollars of tax expense, (2) Weatherford committed additional serial errors in its tax accounting and had never filed an accurate financial statement since 2007, (3) internal controls problems existed as to other areas of Weatherford's tax accounting, and (4) its tax accounting related processes were necessarily complex due to Weatherford's numerous subsidiaries in more than a hundred different countries, GAAP required Weatherford to take whatever steps were necessary to ensure the accuracy and completeness of its financial statements before issuing them to the market, and to make sure the financial statements were free from reasonable uncertainty.  Indeed, by its own admission, Weatherford's material weakness was "a deficiency, or a combination of deficiencies, in internal control over financial reporting such that there is a reasonable possibility that a material misstatement of the company's annual or interim financial statements will not be prevented or detected on a timely basis."  Weatherford was, therefore, required to test all parts of its financial statements affected by that material weakness to ensure compliance with GAAP before issuing a restatement to the public.

## V.    LOSS CAUSATION

165.    Defendants' wrongful conduct directly caused the economic losses suffered by Lead Plaintiffs and the Class.  During the Class Period, the market price of Weatherford stock was artificially inflated as a result of the false and misleading statements made by Defendants.  Accordingly, the Lead Plaintiffs' and Class members' purchases of Weatherford stock during the Class Period were made at artificially inflated prices.  When Defendants' false and misleading statements were revealed to investors, the stock price of Weatherford's shares declined promptly, removing the artificial inflation from Weatherford's stock price and causing substantial losses to investors.

A.      **Weatherford's Corrective Disclosure Of February 21, 2012**

166.    Before the market opened on February 21, 2012, Weatherford announced that it would issue the Second Restatement.  Weatherford's stock price had closed the trading day prior to the announcement at $17.79 per share on volume of 12.8 million shares.  On February 21, Weatherford stock closed at $15.36 per share, down 14%, on heavy volume of 62.6 million shares, five times the volume from the previous day.

167.    Analysts attributed this drop directly to Weatherford's announcement of the Second Restatement.  On February 21, 2012, in a report entitled, "Q4'11 EBIT in-line but tax accounting issues linger," Societe Generale stated, "tax matters had been thought resolved, and WFT shares had been showing some strength recently . . . . WFT shares will likely go back into the penalty box."  Societe Generale followed up after the close of the market with an article entitled, "WFT–Testing Investor Patience....Again!" by stating that "WFT debt and securities . . . took hits directly as a result of the uncertainty related to the tax situation.  The Company's stock price ended the day down 13%."

168.    RBC Capital issued a similar report called "Operations Fine, Tax Uncertainty Dominates," in which RBC noted that "WFT shares were a consensus long heading into the quarter and had handily outperformed the OSX YTD . . . [but] [February 21st's] selloff saw a reversal of this on heavy volume (62mm shares traded) . . . . as solid 4Q11 . . . results and 2012 outlook were offset by GAAP income tax uncertainty, both retroactively and going forward.  Our take is that 2012 guidance points appear reasonable, though have been overwhelmed by lack of clarity on the tax outlook."

169.    The Associated Press similarly reported on February 21, 2012, in an article entitled, "Weatherford's shares tumble on accounting issues," that "[s]hares of oil and gas company Weatherford International Ltd. tumbled Tuesday, a day after the oilfield services

company disclosed that investors should not rely on previously issued financial statements until it can resolve problems with internal controls on financial reporting." Similarly, The Wall Street Journal, in an article entitled, "Weatherford Says Investors Can't Rely on Prior Financials," reported that Weatherford's announcement that "investors should no longer rely upon its previously issued financial statements, sen[t] the oil-field-services company's share price plummeting despite fourth-quarter revenue rising more than expected."

170.    The same day, in an article titled "Weatherford International (WFT) Loses 12.1% As Accounting Situation Lingers, Restatement Amount Increases," FreshBrewed Media similarly wrote: "Weatherford International (NYSE: WFT) opened lower Tuesday after the company said it has yet to fix a situation with the company's internal controls and will still need to restate certain financial results for prior periods. Finally, on February 22, 2012, the Houston Chronicle's Business section in an article entitled, "Accounting," reported that Weatherford's "Shares fell 14 percent to $15.36" after the company announced that "continuing tax accounting problems [would] force it to restate earnings again."

171.    Accordingly, Weatherford's stock price decline on February 21, 2012, was a direct result of the announcement of the Second Restatement. The timing and magnitude of Weatherford's stock price decline, the analyst commentary, and the news reports, all negate any inference that the losses suffered by Lead Plaintiffs and the other Class members were caused by changed market conditions, macroeconomic or industry factors, or even Company-specific facts unrelated to Defendants' fraudulent conduct.

**B.    Weatherford's Corrective Disclosure Of July 24, 2012**

172.    Weatherford announced the Third Restatement after the close of trading on July 24, 2012, and, specifically, that it would again restate its historic tax expense by up to $107 million due to the same tax related issues identified more than a year before. The Company

further announced that it would likely be unable to provide reliable financial statements until at least November 2012.  Weatherford thereby admitted that all of its previously filed financial statements with the SEC, from 2007 through the present, were materially false and misleading and that its internal control problems, despite past assurances, were so egregious that the Company still could not reliably file financial statements that complied with GAAP.

173.    Weatherford's stock price dropped on this news.  On July 24, 2012, Weatherford had stock closed at $12.80 per share on volume of 11.9 million shares.  On July 25, 2012, after the corrective disclosure, Weatherford's stock dropped to $11.67 per share, or almost 9.0%, on volume of 32.8 million shares.

174.    Once again, and unsurprisingly given the importance of its tax reports to Weatherford, news reports attributed this drop directly to the announcement of the Third Restatement.  On July 25, 2012, Bloomberg reported that Weatherford "fell the most in five months after failing to report post-tax second-quarter earnings because of investigations into the company's financial reporting.  The shares slid 8.8 percent to $11.67 at the close in New York, the largest drop since February 21 . . . . Scott Gruber, an analyst at Sanford C. Bernstein & Co. in New York, wrote . . . in a note to investors[] 'Management's inability to complete its financials and provide guidance on the company's future tax rate will continue to weigh significantly on the stock.'"  Standard & Poor's reached the same conclusion in a report labeled "S&P Maintains Hold Opinion On Shares Of Weatherford International": "[o]ngoing tax issues remain a headwind for WFT."  And the Washington Post similarly explained on July 25, 2012, that Weatherford's announcement of the Third Restatement had caused a significant drop in the stock price.

175.    Accordingly, Weatherford's stock price decline on July 24, 2012 was a direct result of the announcement of the Third Restatement.  The timing and magnitude of Weatherford's stock price decline, the analyst commentary, and the news reporting negates any inference that the losses suffered by Lead Plaintiffs and the other Class members were caused by changed market conditions, macroeconomic or industry factors, or even Company-specific facts unrelated to Defendants' fraudulent conduct.

## VI.    DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS

176.    Throughout the Class Period, Defendants made materially false and misleading statements regarding Weatherford's financial performance and condition.  Specifically, in the First and Second Restatement and the announcement of the Third Restatement, Weatherford admitted that it issued materially false and misleading financial statements for each of the reporting periods from 2007 through the first quarter of 2012.  Moreover, because Weatherford's false financial statements violated GAAP, the financials statements filed with the SEC during the Class Period are presumed to be false and misleading pursuant to SEC Regulation S-X, 17 C.F.R. §210.4-01(a)(1).

### A.    False And Misleading Statements Issued In The First Quarter 2011

#### 1.    The Form 8-K Filed With The SEC On March 1, 2011 Was False And Misleading

177.    On March 1, 2011, Weatherford filed with the SEC a Form 8-K, signed by Defendant Becnel, which announced that Weatherford would shortly issue the First Restatement. The 8-K disclosed the overall amount of that restatement, as follows:

> [W]e have identified errors, the correction of which will be adjustments to our historical financial statements and our 2010 fourth quarter earnings release, totaling approximately $500 million for the periods from 2007 to 2010.  The amount for each year is expected to range from $100 million to $150 million.

Approximately $460 million of these adjustments relate to an error in determining the tax consequences of intercompany amounts over multiple years.  These errors have no impact on previously reported operating cash flow.

In addition to the above items, we expect to make adjustments to correct for immaterial items that had been recorded in the incorrect period, which we expect to decrease net income by approximately $20 million in the aggregate for the years 2007 to 2010.

178.   The statement in the preceding paragraph was false and misleading.

(a)   As Weatherford admitted in a Form 8-K filed with the SEC on February 21, 2012, announcing the Second Restatement, the Form 8-K filed on March 1, 2011 and the First Restatement were false.  The announcement of the Second Restatement identified another "roughly $225 million to $250 million of aggregate net adjustments to previously reported financial results for the years 2010 and prior relating to the correction of errors identified with respect to the company's accounting for income taxes."  As a result, the Company admitted on February 21, 2012, that "investors should no longer rely upon our previously issued financial statements," and that "[t]he company intends to file restated financial statements for fiscal 2010 and 2009 in its Form 10-K for the year ended December 31, 2011 as soon as practicable."

(b)   As Weatherford admitted in the Form 8-K filed with the SEC on July 24, 2012, announcing the Third Restatement, the Form 8-K filed on March 1, 2011 and the First Restatement were false.  The announcement of the Third Restatement identified additional "prior period expenses . . . [of] $22 million in 2010; $20 million in 2009 and $16 million in 2008 and before."  In addition, Weatherford announced that "additional tax-related issues could result in further adjustments of up to $15 million."  As a result, the Company admitted on July 24, 2012, that "investors should no longer rely upon our previously issued financial statements," and that "[t]he company intends to file restated financial statements for fiscal 2011, 2010, and 2009 in a

Form 10-K/A for the year ended December 31, 2011 and restated financial statements for the first quarter of 2012 in a Form 10-Q/A as soon as practicable."

      2.      **The Form 10-K Filed With The SEC On March 8, 2011, Which Included The First Restatement, Was False And Misleading**

      (a)      **The Second Restatement Is An Admission That The Financial Results Reported On March 8, 2011 Were False And Misleading**

179.    Weatherford's Form 10-K for the fiscal year ended December 31, 2010 filed on March 8, 2011, restated financial results for the year ended December 31, 2009, and certain financial data for 2008 and prior periods and the quarterly periods ended March 31, June 30 and September 2010.  The Form 10-K was signed by Defendants Duroc-Danner and Becnel.  In that 10-K, Defendants represented that the financial statements contained therein were prepared in conformity with GAAP, stating, "[o]ur discussion and analysis of our financial condition and results of operation is based upon our consolidated financial statements.  We prepare these financial statements in conformity with U.S. generally accepted accounting principles."

180.    Weatherford's Form 10-K for the fiscal year ended December 31, 2010 filed on March 8, 2011 included false and misleading statements.  On March 15, 2012, Weatherford, through its 2011 Form 10-K, restated the financial results reported in the Form 10-K filed on March 8, 2011 (as supplemented  by the April 14, 2011 10-K/A) by:  (1) restating the results for the fiscal year ended December 31, 2010, (2) restating the previously restated financial results for the fiscal year ended December 31, 2009; and (3) restating the financial results for fiscal years 2008 and prior periods.  Specifically, the Second Restatement restated the following relevant line entries from previously issued financial statements for 2010 and 2009, including the 2009 Form 10-K restated in the First Restatement, thereby comprising an admission by Defendants that the previously reported line entries were false and misleading:

**2010 Form 10-K Consolidated Balance Sheet After Second Restatement**
**(In Millions)**

|  | As Previously Reported On March 8, 2011 | As Restated In Second Restatement On March 15, 2012 | Amount Of Second Restatement | Percentage Understated/ Overstated |
|---|---|---|---|---|
| Income Taxes Payable | $43 | $91 | $48 | 53% |
| Retained Earnings | $4,349 | $4,094 | ($255) | 6% |

**2009 Form 10-K Consolidated Balance Sheet After Second Restatement**
**(In Millions)**

|  | As Previously Reported By First Restatement On March 8, 2011 | As Restated In Second Restatement On March 15, 2012 | Amount Of Second Restatement | Percentage Understated/ Overstated |
|---|---|---|---|---|
| Income Taxes Payable | $202 | $279 | $77 | 28% |
| Retained Earnings | $4,457 | $4,246 | ($211) | 5% |

**2010 Form 10-K Consolidated Statement of Operations After Second Restatement**
**(In Millions)**

|  | As Previously Reported On March 8, 2011 | As Restated In Second Restatement On March 15, 2012 | Amount Of Second Restatement | Percentage Understated/ Overstated |
|---|---|---|---|---|
| Provision for Income Taxes | $298 | $339 | $41 | 12% |
| Net Income (Loss) | ($93) | ($134) | ($41) | 30% |
| Net Loss Attributable to Weatherford | ($108) | ($152) | ($44) | 29% |
| Basic EPS | ($0.15) | ($0.20) | ($0.05) | 25% |
| Diluted EPS | ($0.15) | ($0.20) | ($0.05) | 25% |

**2009 Form 10-K Consolidated Statement of Operations after Second Restatement
(In Millions)**

| | As Previously Reported By First Restatement On March 8, 2011 | As Restated In Second Restatement On March 15, 2012 | Amount Of Second Restatement | Percentage Understated/ Overstated |
|---|---|---|---|---|
| Provision for Income Taxes | $87 | $137 | $50 | 36% |
| Net Income (Loss) | $196 | $150 | ($46) | 31% |
| Net Income Attributable to Weatherford | $170 | $124 | ($46) | 37% |
| Basic EPS | $0.24 | $0.17 | ($0.07) | 41% |
| Diluted EPS | $0.24 | $0.17 | ($0.07) | 41% |

181.    For 2008 and prior years, the Second Restatement set forth in the Form 10-K filed

on March 15, 2012, did not provide a detailed breakdown of the $165 million in underreported

taxes.  The Second Restatement only disclosed the following:

> Errors attributable to 2008 and prior totaling $165 million are
> largely attributable to additional reserves for unrecognized tax
> benefits, the recognition of withholding taxes payable, valuation
> allowances on deferred tax assets and other adjustments to our
> current and deferred tax accounts that were identified through the
> additional reconciliations and analyses.  Restatement adjustments
> for unrecognized tax benefits were $60 million and primarily
> related to increases in reserves in jurisdictions outside the United
> States.  Withholding tax and valuation allowance adjustments
> totaled $51 million and $2 million, respectively, while other
> adjustments to our current and deferred tax accounts totaled $52
> million, principally from the reconciliation of our deferred tax
> balances with the tax bases of assets and liabilities in several
> jurisdictions.

182.    The Second Restatement included in Weatherford's Form 10-K for the fiscal year

ended December 31, 2011 filed on March 15, 2012, and set forth in relevant part in paragraphs

179-181, constitutes an admission that the financial results previously reported for fiscal years

2010, 2009, 2008 and prior periods, including those already restated pursuant to the First

Restatement in Weatherford's 2010 Form 10-K filed on March 8, 2011, were false and

misleading, and not prepared in accordance with GAAP.

>        **(b)     The Announced Third Restatement Is An Admission That The
>                  Financial Results Reported On March 8, 2011 Were False And
>                  Misleading**

183.     Weatherford's Form 8-K, filed on July 24, 2012, announced the Third

Restatement and, thereby, admitted that the financial results previously reported for 2010, 2009,

2008 and prior years in the 2010 Form 10-K filed on March 8, 2011 were false and misleading.

The announcement of the Third Restatement identified additional "prior period expenses … [of]

$22 million in 2010; $20 million in 2009 and $16 million in 2008 and before."  Weatherford also

announced that "additional tax-related issues could result in further adjustments of up to $15

million."  As a result, the Company announced that "investors should no longer rely upon our

previously issued financial statements," and that "[t]he company intends to file restated financial

statements for fiscal 2011, 2010, and 2009 in a Form 10-K/A for the year ended December 31,

2011 and restated financial statements for the first quarter of 2012 in a Form 10-Q/A as soon as

practicable."

>        **3.      The Individual Defendants' Certifications That The Financial Results
>                  Reported On March 8, 2011 Were True And Accurate Were False
>                  And Misleading**

184.     Attached as exhibits to the 2010 Form 10-K filed on March 8, 2011, Defendants

Duroc-Danner and Becnel signed certifications stating that the 2010 Form 10-K fairly presented,

in all material respects, the financial condition and results of operations of Weatherford for the

periods presented in the report, and did not contain any untrue statement of material fact or omit

a material fact necessary to make the statements made not misleading.  Specifically, the certifications stated the following:

> 2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

> 3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report.

185.  The Second Restatement included in Weatherford's Form 10-K for the fiscal year ended December 31, 2011 filed on March 15, 2012, and set forth in relevant part in paragraphs 179-181, as well as the announced Third Restatement, constitute admissions that the financial results previously reported for fiscal years 2010, 2009, 2008 and prior periods, including those already restated in Weatherford's 2010 Form 10-K filed on March 8, 2011, were false and misleading, and not prepared in accordance with GAAP, thereby, rendering the certifications for the 2010 Form 10-K signed by Duroc-Danner and Becnel false and misleading.

**B.    Weatherford's Financial Results For The First Three Quarters Of 2011 Were False and Misleading**

**1.    Weatherford's First Quarter 2011 Financial Results Were False And Misleading**

186.  On April 21, 2011, Weatherford issued a press release announcing its financial results for its First Quarter 2011 ended March 31, 2011.  The press release was filed with the SEC as an exhibit to a Form 8-K signed by Defendant Becnel.  The press release contained First Quarter consolidated statements of income and selected income statement information purporting to reflect Weatherford's financial performance in accordance with GAAP, including (i) Provision

For Income Taxes of $19 million, (ii) Net Income of $62 million, (iii) Net Income Attributable to Weatherford of $59 million, (iv) Basic EPS of $0.08, and (v) diluted EPS of $0.08.

187.    On May 10, 2011, Weatherford filed its Form 10-Q for its first fiscal quarter ended March 31, 2011, signed by Defendants Duroc-Danner and Becnel.  The Form 10-Q reiterated the financial results announced in the Company's April 21, 2011 Form 8-K and represented that Weatherford's financial statements were prepared in accordance with GAAP. Attached as exhibits to the Form 10-Q were certifications signed by Defendants Duroc-Danner and Becnel.  The certifications stated that the 2011 First Quarter Form 10-Q fairly presented, in all material respects, the financial condition and results of operations of Weatherford for the periods presented in the report and did not contain any untrue statement of material fact or omit a material fact necessary to make the statements made not misleading.  Specifically, the certifications stated the following:

> 2.    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

> 3.    Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report.

188.    Defendants' statements set forth at paragraphs 186-187 were materially false and misleading because the Second Restatement restated the First Quarter 2011 financial results reported in Weatherford's Form 8-K filed April 21, 2011 and Form 10-Q filed May 10, 2011. When Weatherford restated the First Quarter 2011 results pursuant to the Second Restatement, it admitted, among other things, that its income tax provision had been understated by $27 million

and its net income had been overstated by $23 million.  Specifically, the Second Restatement

restated the following line entries in Weatherford's First Quarter 2011 Forms 8-K and 10-Q:

**First Quarter 2011 Statement of Operations After Second Restatement**
**(In Millions)**

|  | As Reported in 8-K on April 21, 2011 and 10-Q On May 10, 2011 | As Restated in Second Restatement On March 15, 2012 | Amount of Second Restatement | Percentage Understated/ Overstated |
|---|---|---|---|---|
| Provision for Income Taxes | $19 | $46 | $27 | 59% |
| Net Income (Loss) | $62 | $39 | ($23) | 59% |
| Net Income (Loss) Attributable to Weatherford | $59 | $37 | ($22) | 59% |
| Basic EPS | $0.08 | $0.05 | ($0.03) | 60% |
| Diluted EPS | $0.08 | $0.05 | ($0.03) | 60% |

189.    Weatherford's Second Restatement constitutes an admission that the financial

results set forth in the preceding paragraph as reported in Weatherford's First Quarter 2011 Form

8-K filed with the SEC on April 21, 2011, and Form 10-Q filed with the SEC on May 10, 2011,

were not prepared in accordance with GAAP and were false and misleading.

### 2.    Weatherford's Second Quarter 2011 Financial Results Were False And Misleading

190.    On July 26, 2011, Weatherford issued a press release announcing its financial

results for its Second Quarter 2011 ended June 30, 2011.  The press release was filed with the

SEC as an exhibit to a Form 8-K signed by Defendant Becnel.  The press release contained

Second Quarter consolidated statements of income and selected income statement information

purporting to reflect Weatherford's financial performance in accordance with GAAP, including

(i) Provision For Income Taxes of $46 million, (ii) Net Income of $115 million, (iii) Net Income

Attributable to Weatherford of $110 million, (iv) Basic EPS of $0.15, and (v) diluted EPS of

$0.15.

191.    On July 29, 2011, Weatherford filed with the SEC its Form 10-Q for its Second

Quarter ended June 30, 2011, signed by Defendants Duroc-Danner and Becnel.  The Form 10-Q

reiterated the financial results announced in the Company's July 26, 2011 Form 8-K and

represented that Weatherford's financial statements were prepared in accordance with GAAP.

Attached as exhibits to the Second Quarter 2011 Form 10-Q were certifications signed by

Defendants Duroc-Danner and Becnel.  The certifications stated that the Form 10-Q fairly

presented, in all material respects, the financial condition and results of operations of

Weatherford for the periods presented in the report and did not contain any untrue statement of

material fact or omit a material fact necessary to make the statements made not misleading.

Specifically, the certifications stated the following:

> 2.    Based on my knowledge, this report does not contain any
> untrue statement of a material fact or omit to state a
> material fact necessary to make the statements made, in
> light of the circumstances under which such statements
> were made, not misleading with respect to the period
> covered by this report;

> 3.    Based on my knowledge, the financial statements, and
> other financial information included in this report, fairly
> present in all material respects the financial condition,
> results of operations and cash flows of the registrant as of,
> and for, the periods presented in this report.

192.    Defendants' statements set forth at paragraphs 190-191 were materially false and

misleading because the Second Restatement restated the Second Quarter 2011 financial results

reported in Weatherford's Form 8-K filed July 26, 2011 and Form 10-Q filed July 29, 2011.

When Weatherford restated the Second Quarter 2011 results pursuant to the Second Restatement,

it admitted, among other things, that its income tax provision had been understated by $30

million and its net income had been overstated by $35 million.  Specifically, the Second

Restatement restated the following line entries in Weatherford's Second Quarter 2011 Forms 8-K

and 10-Q:

**Second Quarter 2011 Statement of Operations After Second Restatement**
**(In Millions)**

|  | As Reported in 8-K on July 26, 2011 and 10-Q On July 29, 2011 and | As Restated in Second Restatement On March 15, 2012 | Amount of Second Restatement | Percentage Understated/ Overstated |
|---|---|---|---|---|
| Provision for Income Taxes | $46 | $76 | $30 | 39% |
| Net Income (Loss) | $115 | $80 | ($35) | 44% |
| Net Income (Loss) Attributable to Weatherford | $110 | $76 | ($34) | 45% |
| Basic EPS | $0.15 | $0.10 | ($0.05) | 50% |
| Diluted EPS | $0.15 | $0.10 | ($0.05) | 50% |

193.    Weatherford's Second Restatement constitutes an admission that the financial

results set forth in the preceding paragraph as reported in Weatherford's Second Quarter 2011

Form 8-K filed with the SEC on July 26, 2011, and Form 10-Q filed with the SEC on July 29,

2011, were not prepared in accordance with GAAP and were false and misleading.

**3.      Weatherford's Third Quarter 2011 Financial Results**
**Were False And Misleading**

194.    On October 25, 2011, Weatherford issued a press release announcing its financial

results for its Third Quarter 2011 ended September 30, 2011.  The press release was filed with

the SEC as an exhibit to a Form 8-K and signed by Defendant Becnel.  The press release

contained Third Quarter consolidated statements of income and selected income statement

information purporting to reflect Weatherford's financial performance in accordance with

74

GAAP, including (i) Provision For Income Taxes of $82 million, (ii) Net Income of $193 million, (iii) Net Income Attributable to Weatherford of $190 million, (iv) Basic EPS of $0.25, and (v) diluted EPS of $0.25.

195.   On October 27, 2011, Weatherford filed with the SEC its Form 10-Q for its Third Quarter ended September 30, 2011, signed by Defendants Duroc-Danner and Becnel.  The Form 10-Q reiterated the financial results announced in the Company's October 25, 2011 Form 8-K and represented that Weatherford's financial statements were prepared in accordance with GAAP.  Attached as exhibits to the Third Quarter 2011 Form 10-Q were certifications signed by Defendants Duroc-Danner and Becnel.  The certifications stated that the Form 10-Q fairly presented, in all material respects, the financial condition and results of operations of Weatherford for the periods presented in the report and did not contain any untrue statement of material fact or omit a material fact necessary to make the statements made not misleading.  Specifically, the certifications stated the following:

> 2.      Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

> 3.      Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report.

196.   Defendants' statements set forth at paragraphs 194-195 were materially false and misleading because the Second Restatement restated the Third Quarter 2011 financial results reported in Weatherford's Form 8-K filed October 25, 2011 and Form 10-Q filed October 27, 2011.  When Weatherford restated the Third Quarter 2011 results pursuant to the Second

Restatement, it admitted, among other things, that its income tax provision had been understated by $61 million and its net income had been overstated by $60 million.  Specifically, the Second Restatement restated the following line entries in Weatherford's Second Quarter 2011 Forms 8-K and 10-Q:

**Third Quarter 2011 Statement Of Operations After Second Restatement**
**(In Millions)**

| | As Reported in 8-K on October 25, 2011 and 10-Q On October 27, 2011 | As Restated in Second Restatement On March 15, 2012 | Amount of Second Restatement | Percentage Understated/ Overstated |
|---|---|---|---|---|
| Provision for Income Taxes | $82 | $143 | $61 | 43% |
| Net Income (Loss) | $193 | $133 | ($60) | 45% |
| Net Income (Loss) Attributable to Weatherford | $190 | $130 | ($60) | 46% |
| Basic EPS | $0.25 | $0.17 | ($0.08) | 47% |
| Diluted EPS | $0.25 | $0.17 | ($0.08) | 47% |

197.    Weatherford's Second Restatement constitutes an admission that the financial results set forth in the preceding paragraph as reported in Weatherford's Third Quarter 2011 Form 8-K filed with the SEC on October 25, 2011, and Form 10-Q filed with the SEC on October 27, 2011, were not prepared in accordance with GAAP and were false and misleading.

198.    The Third Quarter 2011 Form 10-Q also falsely reassured the public that Defendants had taken extra steps to overcome whatever material weaknesses existed and comply with GAAP (emphasis supplied):

In light of this material weakness, in preparing our condensed consolidated financial statements included in this Quarterly Report on Form 10-Q, **we performed additional reconciliations and other post-closing procedures to ensure our condensed consolidated financial statements have been prepared in accordance with U.S. generally accepted accounting principles.** Accordingly, management believes the condensed consolidated financial statements included in the Quarterly Report on Form 10-Q fairly present, in all material respects, our financial condition, results of operations and cash flows as of and for each of the periods presented.

199.     Weatherford's Second Restatement constitutes an admission that the Company's statement (emphasis supplied) in the Third Quarter 2011 that, "[it had] performed additional reconciliations and other post-closing procedures to **ensure** [that] our condensed consolidated financial statements have been prepared **in accordance with U.S. generally accepted accounting principles**," was false.  The consolidated financial statements were not prepared in accordance with GAAP, rendering the Company's assurance false and misleading.

C.     **False And Misleading Statements Issued In The First Quarter 2012**

1.     **The Form 8-K Filed With The SEC On February 21, 2012 Was False And Misleading**

200.     On February 21, 2012, Weatherford issued a press release announcing the Second Restatement and its financial results for its fourth fiscal quarter and year ended December 31, 2011.  The press release was filed with the SEC as an exhibit to a Form 8-K signed by Defendant Becnel.  The press release reported the Company's Fourth Quarter and year-end results on a pre-tax basis, asserting that "[m]anagement ha[d] concluded that the company ha[d] not yet remediated its previously disclosed material weakness in internal controls over financial reporting for income taxes."  Accordingly, Defendants announced the Second Restatement and advised investors that they "should no longer rely on our previously issued financial statements,"

including the financial statements already restated in March 2011 pursuant to the First Restatement.

201.     According to the Form 8-K, Defendants expected the Second Restatement to result in "roughly $225 million to $250 million of aggregate net adjustments to previously reported financial results for the years 2010 and prior relating to the correction of errors identified with respect to the company's accounting for income taxes."  The Form 8-K further represented that "roughly two-thirds [of the aggregate net adjustments] [was] attributable to fiscal years ending on or prior to December 31, 2008."  The Form 8-K also asserted that the pre-tax results contained therein reflected the Company's financial performance in accordance with GAAP.

202.     The statements in the preceding paragraph were false and misleading.  As Weatherford admitted in the Form 8-K filed with the SEC on July 24, 2012, announcing the Third Restatement, the Second Restatement was false.  The announcement of the Third Restatement identified additional "prior period expenses . . . [of] $22 million in 2010; $20 million in 2009 and $16 million in 2008 and before."  In addition, Weatherford announced that "additional tax-related issues could result in further adjustments of up to $15 million.  As a result, the Company announced that "investors should no longer rely upon our previously issued financial statements, and that "[t]he company intends to file restated financial statements for fiscal 2011, 2010, and 2009 in a Form 10-K/A for the year ended December 31, 2011 and restated financial statements for the first quarter of 2012 in a Form 10-Q/A as soon as practicable."

### 2. The Form 10-K Filed With The SEC On March 15, 2012, Which Included The Second Restatement, Was False And Misleading

203.    On March 15, 2012, Weatherford filed with the SEC its Form 10-K for the year ended December 31, 2011, signed by Defendants Duroc-Danner and Becnel.  The 2011 Form 10-K included the Second Restatement, which restated Weatherford's financial results for the fiscal years ended December 31, 2010 and 2009; the first three quarters of 2011; the first three quarters of 2010; and certain financial results from 2008 and prior.  Attached as exhibits to the 2011 Form 10-K were certifications signed by Defendants Duroc-Danner and Becnel.  The certifications stated that the 2011 Form 10-K fairly presented, in all material respects, the financial condition and results of operations of Weatherford for the periods presented in the report and did not contain any untrue statement of material fact or omit a material fact necessary to make the statements made not misleading.  Specifically, the certifications stated the following

> 2.    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

> 3.    Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report.

204.    Defendants' statements set forth at paragraph 203 were false and misleading.  On July 24, 2012, Weatherford filed a Form 8-K with the SEC that announced that the Company would restate the financial results reported in Weatherford's 2011 Form 10-K issued on March 15, 2012, and Weatherford's First Quarter 2012 Form 10-Q.  The Third Restatement has not been issued.

(a)     The July 24, 2012 Form 8-K specified that the Third Restatement would restate the financial statements for fiscal years 2011, 2010 and 2009, as well as restated selected financial data for fiscal 2007 through 2011, and restate quarterly financial data for each of the reported quarters for fiscal years 2012, 2011, and 2010.

(b)     More specifically, the announcement of the Third Restatement admitted that the Company's income tax provision reported in the 2011 Form 10-K filed on March 15, 2012 had been understated by at least $34 million in 2011, $22 million in 2010, $20 million in 2009, and $16 million in 2008 and prior periods, and that the 2011 Form 10-K was not prepared in accordance with GAAP.

(c)     The July 24, 2012 Form 8-K further explained that the full financial impact of the Third Restatement was still uncertain because the Company had not completed its analysis and "additional issues related to the accounting for income taxes in prior periods . . . . could result in further adjustments of up to $15 million."

**D.     Defendants' False And Misleading Statements Concerning The Financial Results For The First Quarter 2012**

205.    On April 24, 2012, Weatherford issued a press release announcing its financial results for the First Quarter ended March 31, 2012.  The press release was filed with the SEC as an exhibit to a Form 8-K signed by the current Chief Financial Officer, Briscoe.  The press release contained First Quarter consolidated statements of income and selected income statement information purporting to reflect Weatherford's financial performance in accordance with GAAP.

206.    On May 8, 2012, Weatherford filed its Form 10-Q for the quarter ended March 31, 2012, signed by Defendant Duroc-Danner and the current Chief Financial Officer, Briscoe. The Form 10-Q reiterated the financial results announced in the Company's April 23, 2012 Form

80

8-K and represented that Weatherford's financial statements were prepared in accordance with

GAAP.  Attached as exhibits to the 2012 First Quarter Form 10-Q were certifications signed by

Defendant Duroc-Danner and the current Chief Financial Officer Briscoe.  The certifications

stated that the Form 10-Q fairly presented, in all material respects, the financial condition and

results of operations of Weatherford for the periods presented in the report and did not contain

any untrue statement of material fact or omit a material fact necessary to make the statements

made not misleading.  Specifically, the certifications stated the following

> 2.     Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

> 3.     Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report.

207.     Defendants' statements set forth at paragraphs 205-206 were materially false and

misleading.  On July 24, 2012, Defendants announced that the Third Restatement would restate

the First Quarter 2012 financial results announced in the April 23, 2012 press release, and

reported in the Form 10-Q filed May 8, 2012.

208.     In announcing the Third Restatement, Defendants admitted that the Company's

income tax provision reported in the April 23, 2012 Form 8-K and the First Quarter 2012 Form

10-Q had been inaccurate and was not prepared in accordance with GAAP.  In the July 24, 2012

Form 8-K announcing the Third Restatement, Weatherford explained that the full financial

impact of the Third Restatement was still uncertain because the Company had not completed its

analysis and "additional issues related to the accounting for income taxes in prior periods . . . . could result in further adjustments of up to $15 million."

## VII.   CLASS ACTION ALLEGATIONS

209.   Lead Plaintiffs bring this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons and entities that purchased or acquired Weatherford common stock in the United States between March 2, 2011 and July 24, 2012, inclusive, and who were damaged thereby (the "Class").

210.   Excluded from the Class are:  (i) Defendants; (ii) members of the immediate family of any Defendant; (iii) any person who was an officer or director of Weatherford during the Class Period; (iv) any firm, trust, corporation, officer, or other entity in which any Defendant has or had a controlling interest; (v) Defendants' directors' and officers' liability insurance carriers, and any affiliates or subsidiaries thereof; (vi) the Company's employee retirement and benefit plan(s); and (vi) the legal representatives, agents, affiliates, heirs, successors-in-interest, or assigns of any such excluded party.

211.   While the exact number of Class members is unknown to Lead Plaintiffs at this time, and can only be ascertained through appropriate discovery, Lead Plaintiffs believe that there are thousands of members in the proposed Class.  Throughout the Class Period, Weatherford common stock had an average daily volume of approximately 13,078,626 million shares.  As of July 25, 2012, Weatherford had 759,624,000 number of shares outstanding.

212.   The members of the Class are so numerous that joinder of all members is impracticable.  Record owners and other members of the Class may be identified from records maintained by Weatherford and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

213.    Lead Plaintiffs' claims are typical of the claims of the other members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of the federal securities laws alleged herein.

214.    Lead Plaintiffs will fairly and adequately protect the interests of the members of the Class, and Lead Counsel is competent and experienced in class actions and securities litigation.  Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)    whether the SEC filings, press releases, and other public statements disseminated to the investing public during the Class Period contained material misstatements or omit to state material information;

(c)    whether and to what extent the market price of Weatherford's common stock was artificially inflated during the Class Period due to the non-disclosures and/or misrepresentations complained of herein;

(d)    whether, and to what extent, Defendants acted with scienter;

(e)    whether reliance may be presumed pursuant to the fraud-on-the-market doctrine;

(f)    whether there is a causal connection between Defendants' false statements and omissions and the corrective disclosures alleged herein; and

(g)    to what extent the members of the Class have sustained damages and the proper measure of damages.

215.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## VIII.   PRESUMPTION OF RELIANCE

216.     Lead Plaintiffs are entitled to a presumption of reliance on Defendants' material misrepresentations and omissions pursuant to the fraud-on-the-market doctrine.  At all relevant times, the market for Weatherford's common stock was efficient for the following reasons, among others:

(a)     Weatherford's stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)     Weatherford's common stock traded at high weekly volumes during the Class Period;

(c)     As a regulated issuer, Weatherford filed periodic reports with the SEC and NYSE;

(d)     During the class period, Weatherford was eligible to file registration statements with the SEC on Form S-3

(e)     Weatherford regularly communicated with public investors via established market communication mechanisms, including through earnings conference calls, regular disseminations of press releases on the national circuits of major newswire services, and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(f)      Weatherford was followed by numerous securities analysts employed by major brokerage firms who wrote reports that were distributed to those brokerage firms' sales force and certain customers.  Each of these reports was publicly available and entered the public market place.

217.    As a result of the foregoing, the market for Weatherford stock promptly digested current information regarding Weatherford from all publicly available sources and reflected such information in Weatherford's stock price.  The material misrepresentations alleged herein induced reasonable investors to misjudge the value of Weatherford's common stock.  Under these circumstances, all purchasers of Weatherford common stock during the Class Period suffered similar injury through their purchase of Weatherford common stock at artificially inflated prices, and a presumption of reliance applies.

## IX.    NO SAFE HARBOR

218.    The statutory safe harbor and/or bespeaks caution doctrine applicable to forward looking statements under certain circumstances do not apply to any of the false and misleading statements pleaded in this Complaint.

219.    None of the statements complained of herein was a forward-looking statement.  Rather, they were historical statements or statements of purportedly current facts and conditions at the time the statements were made, including statements about Weatherford's financial results, its reported net income, provision for taxes, and earnings per share, among others.

220.    The statutory safe harbor also does not apply to statements included in financial statements that purportedly were made in accordance with GAAP, such as Weatherford's Forms 8-K, 10-K and 10-Q issued throughout the Class Period.

221.    To the extent that any of the false and misleading statements alleged herein can be construed as forward looking, those statements were not accompanied by meaningful cautionary

language identifying important facts that could cause actual results to differ materially from those in the statements.  As set forth above in detail, then-existing facts contradicted Defendants' statements regarding Weatherford's financial results, its reported net income, provision for income taxes, and earnings per share, among others.  Given the then-existing facts contradicting Defendants' statements, the generalized risk disclosures made by Weatherford were not sufficient to insulate Defendants from liability for their materially false and misleading statements.

222.    To the extent that the statutory safe harbor does apply to any forward looking statements pleaded herein, Defendants are liable for those false forward looking statements because, at the time each of those statements was made, the particular speaker knew that the particular forward looking statement was false, and/or the false forward looking statement was authorized and/or approved by an executive officer of Weatherford who knew that the statement was false when made.

## X.    CAUSES OF ACTION

### COUNT  I

### FOR VIOLATIONS OF SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b-5 PROMULGATED THEREUNDER AGAINST ALL DEFENDANTS

223.    Lead Plaintiffs repeat and re-allege each and every allegation set forth above as if fully set forth herein.  This Count is asserted against Defendants for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

224.    During the Class Period, Defendants disseminated or approved the false statements specified below, which they knew or recklessly disregarded were misleading in that

they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

225.    Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they made untrue statements of material facts or omit to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.  As detailed herein, the misrepresentations contained in those statements, or the material facts omitted therefrom, included, but were not limited to, the Company's publicly reported net income, earnings per share, tax-accounting related financial reporting, and statements of compliance with GAAP in the preparation of Weatherford's financial statements.

226.    Defendants, individually and in concert, directly and indirectly, by the use of means or instrumentalities of interstate commerce and/or of the mails, made untrue and/or misleading statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and made the false and misleading statements intentionally or with reckless disregard for the truth.  Throughout the Class Period, these false and misleading statements did: (a) deceive the investing public, including Lead Plaintiffs and the Class, regarding, among other things, Weatherford's net income, earnings per share, tax-accounting related financial reporting, and the Company's failure to comply with GAAP; (b) artificially inflate the market price of Weatherford common stock; and (c) cause Lead Plaintiffs and other members of the Class to purchase Weatherford common stock at artificially inflated prices and suffer damages when the true facts became known.

227.    Defendants are liable for the materially false and misleading statements made in:

(a)    Weatherford's 2010 Form 10-K filed on March 8, 2011 (*supra* ¶¶ 179-185);

(b)    Weatherford's First Quarter 2011 Form 10-Q filed on May 10, 2011 (*supra* ¶¶ 187-189);

(c)    Weatherford's Second Quarter 2011 Form 10-Q filed on July 29, 2011 (*supra* ¶¶ 191-193);

(d)    Weatherford's Third Quarter 2011 Form 10-Q filed on October 27, 2011, (*supra* ¶¶ 195-199);and

(e)    Weatherford's 2011 Form 10-K filed on March 15, 2012 (*supra* ¶¶ 203-204).

228.    Defendants Weatherford and Becnel are also liable for the materially false and misleading statements made in:

(a)    Weatherford's Form 8-K filed on March 1, 2011 (*supra* ¶¶ 177-178);

(b)    Weatherford's Form 8-K filed on April 21, 2011  (supra ¶¶ 186-189);

(c)    Weatherford's Form 8-K filed on July 26, 2011 (*supra* ¶¶ 190-193);

(d)    Weatherford's  Form 8-K filed on October 25, 2011 (*supra* ¶¶ 194-199);

(e)    Weatherford's  Form 8-K filed on February 21, 2012 (*supra* ¶¶ 200-202);

229.    Defendants Weatherford and Duroc-Danner are also liable for the materially false and misleading statements made in:

(a)    Weatherford's Form 8-K filed on April 24, 2012 (*supra* ¶¶ 205-208) and;

(b)     Weatherford's First Quarter 2012 Form 10-Q filed on May 8, 2012 (*supra* ¶¶ 206-208).

230.    As described above, Defendants acted with scienter throughout the Class Period, in that they either had actual knowledge of the false and misleading statements and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them.  More specifically, Defendants knew or recklessly disregarded that Weatherford issued false and misleading financial statements in violation of GAAP during the Class Period.

231.    The above allegations, as well as the allegations pertaining to the overall scope, breadth, timing, and size of the fraud at Weatherford, which resulted in the continuous and material overstatement of the Company's most important financial metrics, including net income and earnings per share, establish a strong inference that Defendants acted with scienter in making the materially false and misleading statements set forth above during the Class Period.

232.    Lead Plaintiffs and the Class have suffered damages in that, in direct reliance on the integrity of the market, they paid artificially inflated prices for Weatherford common stock, which inflation was removed from the stock when the true facts became known. Lead Plaintiffs and the Class would not have purchased Weatherford common stock at the prices they paid, or at all, if they had been aware that the market price had been artificially and falsely inflated by Defendants' false and misleading statements.

233.    As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages attributable to the fraud alleged herein in connection with their purchases of Weatherford common stock during the Class Period.

## COUNT II

### FOR VIOLATIONS OF SECTION 20(a) OF THE EXCHANGE ACT
### AGAINST THE INDIVIDUAL DEFENDANTS

234.    Lead Plaintiffs repeat and re-allege each and every allegation set forth above as if fully set forth herein. This Count is asserted against each of the Individual Defendants for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

235.    During their tenures as officers of Weatherford, each of the Individual Defendants was a controlling person of the Company within the meaning of Section 20(a) of the Exchange Act. By reason of their positions of control and authority as officers and/or directors of Weatherford, the Individual Defendants had the power and authority to direct the management

and activities of the Company and its employees, and to cause the Company to engage in the wrongful conduct complained of herein.  These Defendants were able to and did control, directly and indirectly, the content of the public statements made by Weatherford during the Class Period, thereby causing the dissemination of the false and misleading statements and omissions of material facts as alleged herein.

236.    In their capacities as senior corporate officers of the Company, and as more fully described above, the Individual Defendants Duroc-Danner and Becnel had direct involvement in the day-to-day operations of the Company, in reviewing and managing its regulatory and legal compliance, and in its accounting and reporting functions.

237.    Defendants Duroc-Danner and Becnel signed the Company's SEC filings during the Class Period, and were directly involved in providing false information and certifying and/or approving the false statements disseminated by Weatherford during the Class Period.

238.    As a result of the foregoing, the Individual Defendants as a group and individually, were controlling persons of Weatherford within the meaning of Section 20(a) of the Exchange Act.  As set forth above, Weatherford violated Section 10(b) of the Exchange Act by its acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons of Weatherford, and as a result of their own aforementioned conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act, jointly and severally with, and to the same extent as the Company is liable under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, to Lead Plaintiffs and the other members of the Class who purchased or otherwise acquired Weatherford common stock.

239.    Moreover, as detailed above, during the respective times the Individual Defendants served as officers and/or directors of Weatherford, each of the Individual Defendants

was culpable for the material misstatements and omissions made by Weatherford, including such false and misleading statements as the Company's false financial statements, including false statements concerning Weatherford's net income, earnings per share, and tax-accounting as set forth above.

240.     As a direct and proximate result of these Defendants' conduct, Lead Plaintiffs and the other members of the Class suffered damages in connection with their purchase or acquisition of Weatherford common stock

## XI.     PRAYER FOR RELIEF

241.     WHEREFORE, Lead Plaintiffs, on behalf of themselves and the other members of the Class, prays for judgment as follows:

(a)     declaring this action to be a proper class action maintainable pursuant to Rule 23 of the Federal Rules of Civil Procedure;

(b)     awarding compensatory damages in favor of Lead Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)     awarding Lead Plaintiffs and the other members of the Class their reasonable costs and expenses in this litigation, including attorneys' fees and experts' fees and other costs and disbursements; and

(d)     awarding Lead Plaintiffs and the other members of the Class such other and further relief as the Court may deem just and proper.

## XII.   JURY TRIAL DEMANDED

242.   Lead Plaintiffs hereby demand a trial by jury of all issues so triable.


Dated: September 14, 2012                         Respectfully submitted,

                                                  LABATON SUCHAROW LLP

                                                  By:   _____

                                                  Eric Belfi (EB-8895)
                                                  Javier Bleichmar (JB-0435)
                                                  Wilson Meeks (WM-1066)
                                                  Danielle Stampley (DS-0824)
                                                  140 Broadway
                                                  New York, New York 10005
                                                  Telephone: (212) 907-0700
                                                  Facsimile: (212) 818-0477
                                                  ebelfi@labaton.com
                                                  jbleichmar@labaton.com
                                                  wmeeks@labaton.com
                                                  dstampley@labaton.com

                                                  *Lead Counsel for Lead Plaintiffs and*
                                                  *Proposed Lead Counsel for the*
                                                  *Putative Class*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

GLENN FREEDMAN, individually and on
behalf of all others similarly situated,

        Plaintiff,

    v.

WEATHERFORD INTERNATIONAL LTD.,
BERNARD J. DUROC-DANNER, and
ANDREW P. BECNEL,

        Defendants.

Case No. 1:12-cv-2121 (LAK)

**CERTIFICATE OF SERVICE**

I, Wilson Meeks hereby certify that on September 14, 2012, true and correct copies of the annexed Consolidated Amended Class Action Complaint were served in accordance with the Federal Rules of Civil Procedure and pursuant to the parties' agreement, via electronic mail upon counsel for Defendants:

Kevin H. Metz
Peter A. Wald
Sarah A. Greenfield
Latham & Watkins LLP (DC)
555 Eleventh Street, NW, Suite 1000
Washington, DC 20004
*Counsel for Defendants*

LABATON SUCHAROW LLP

By: _____
    Wilson Meeks

140 Broadway
New York, New York 10005
(212) 907-0700

*Counsel for Co-Lead Plaintiffs Anchorage*
*Police & Fire Retirement System and*
*Sacramento City Employees' Retirement*
*System*