UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
GLENN FREEDMAN, individually and on behalf of all others
similarly situated,

                           Plaintiff,


            -against-                                                    12 Civ. 2121 (LAK)


WEATHERFORD INTERNATIONAL LTD., BERNARD J.
DUROC-DANNER, and ANDREW P. BECNEL,

                           Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


## MEMORANDUM OPINION


            Appearances:

Eric J. Belfi                                      Peter A. Wald
Javier J. Bleichmar                                Kevin H. Metz
Wilson Meeks                                       Sarah A. Greenfield
Danielle Stampley                                  LATHAM & WATKINS, LLP
LABATON SUCHAROW LLP


Attorneys for Lead Plaintiffs Anchorage Police     Attorneys for Defendants
& Fire Retirement System and Sacramento City
Employees' Retirement System


LEWIS A. KAPLAN, *District Judge.*

            This is one of two cases pending before this Court regarding a series of earnings

restatements issued by defendant Weatherford International, Ltd. ("Weatherford" or the

"Company"), in connection with its accounting for tax expense. The first of these cases, *Dobina v.*

*Weatherford*,[1] concerns allegations that defendants committed securities fraud through statements made from 2007 through 2010, prior to the first earnings restatement that the Company issued in March 2011.  This Court granted in part and denied in part a motion to dismiss in that case.  It concluded that plaintiffs there had failed to allege a strong inference of *scienter* with respect to Weatherford's 2007–2010 statements about its tax expense, but that they adequately had alleged *scienter* with respect to its 2007–2010 statements about the adequacy of its internal controls.

This case picks up where *Dobina* left off.  Subsequent to the March 2011 restatement, the Company announced additional restatements in February and July 2012, respectively.  Plaintiffs here allege that the Company falsely and fraudulently represented its tax expense beginning with the March 2011 restatement and continuing until the third restatement in July 2012.

The matter is before the Court on defendants' motion to dismiss.  For the reasons set forth below, the motion is denied.

*Facts*

A.     *The First Restatement*

As this Court discussed in more detail in *Dobina*, the Company from 2007 to 2010 regularly touted as one of its key competitive advantages its favorable effective tax rates, which it attributed to its refined international tax structure.  The purportedly lower rates proved illusory, however.  On March 1, 2011, the Company announced that it would file its 2010 Annual Report due on that day late , because it had identified a "'material weakness in internal control over financial

---

[1]

909 F. Supp. 2d 228 (S.D.N.Y. 2012).

reporting for income taxes.'"[2]   It stated:

> "The Company's processes, procedures, and controls related to financial reporting were not effective to ensure that amounts related to current taxes payable, certain deferred tax assets and liabilities, reserves for uncertain tax positions, the current and deferred income tax expense and related footnote disclosures were accurate.   Specifically, our processes and procedures were not designed to provide for adequate and timely identification and review of various income tax calculations, reconciliations, and related supporting documentation required to apply our accounting policies for income taxes in accordance with US GAAP. The principal factors contributing to the material weakness were 1) inadequate staffing and technical expertise within the company related to taxes, 2) ineffective review and approval practices relating to taxes, 3) inadequate processes to effectively reconcile income tax accounts and 4) inadequate controls over the preparation of quarterly tax provisions."[3]

In light of the identified internal control deficiencies, the March 1 statement asserted that the Company had conducted "additional testing" to identify "any material errors in our accounting for income taxes" and that it had "substantially completed the testing procedures."[4]   It concluded that its prior statements had understated the Company's actual tax expense by approximately $500 million from 2007–2010.[5]   The statement indicated that the Company expected to finalize its restatement by March 15, 2011.[6]   It set forth also a "Remediation Plan," indicating that the Company planned, *inter alia*, to redesign the tax accounting processes, hire additional experienced personnel, increase the frequency of reconciliations, and implement a quarterly review

---

[2]

   CCAC ¶ 39.

[3]

   Greenfield Decl., Ex. B.

[4]

   CCAC ¶ 41.

[5]

   *Id.*

[6]

   CCAC ¶ 42.

4

process.[7]

In a conference call the next day, Company officers including Duroc-Danner and Becnel added more detail to the March 1 statement. They explained that most of the understated expense derived from improperly reported tax-affecting inter-company transactions and claimed that the company had not erred in its payment of cash taxes, only in its accounting for tax expense.[8] When asked about whether the failure to file a timely 10-K would affect any debt covenants, Becnel stated that it would not but added, "'We do need to be sure to file our 10-K before March 15 and at this point, we expect to do so.'"[9] The complaint alleges that, indeed, Weatherford's failure to file the report by March 15 would cause it to default on its debt.[10]

On March 8, 2011, Weatherford filed its Form 10-K, restating its earnings as anticipated and repeating many of the statements previously discussed.[11] On March 11, it provided more detail about the timing of its discovery of the material weakness in response to a Securities and Exchange Commission inquiry. The Company indicated that it first had discovered the material weakness on February 15, identified a $308 million error on February 20, and then identified another

---

[7]    Greenfield Decl., Ex. B.

[8]    CCAC ¶ 47.

[9]    *Id.* ¶ 49.

[10]    *Id.*

[11]    *Id.* ¶ 50.

    The restatement allegedly adjusted the Company's effective tax rate from 23 to 33 percent in 2007, from 15 to 22 percent in 2008, from 7 to 31 percent in 2009, and from 17 to 52 percent in 2010. *Id.* ¶ 55.

$192 million in errors over the next eight days, and on February 28, notified its audit committee, which then authorized the public statement issued the next day.[12]

### B.   Subsequent 2011 Financial Statements

The complaint alleges that defendants "continued to tout the benefits of the Company's tax planning" and its apparently low effective tax rates in further financial statements in 2011.[13]

On July 29, 2011, the Company issued a Form10-Q that discussed the material weakness reported in March as well as some remedial actions it had taken and others that were planned.  It stated that "because many of the remedial actions have only recently been undertaken and because some of our remediation plans will be put in place over the remainder of the year, management will not be able to conclude that the material weakness has been remediated until, at the earliest, the completion of the 2011 year-end income tax provision."[14]  The 10-Q included in its risk disclosures the possibility that failure to remediate the material weakness could result in the loss of investor confidence in the accuracy of the Company's financial reports.[15]

On October 27, 2011, the Company issued another 10-Q that made all of the same statements.  That 10-Q added:

---

[12]

   *Id.* ¶ 52.

[13]

   *Id.* ¶ 57.

[14]

   Greenfield Decl., Ex. E at 41.

[15]

   *Id.* at 38.

6

"In light of this material weakness, . . . we performed additional reconciliations and other post-closing procedures to ensure our condensed consolidated financial statements have been prepared in accordance with [GAAP].   Accordingly, management believes [this 10-Q] fairly present[s], in all material respects, our financial condition, results of operations and cash flows as of and for each of the periods presented."[16]

C.      *Second Restatement*

On February 21, 2012, the Company announced that it would have to restate its tax expense for a second time and that previously issued financial statements should not be relied upon. It concluded that it had not "remediated its previously disclosed material weakness in internal controls over financial reporting relating to current taxes payable, certain deferred tax assets and liabilities, reserves for uncertain tax positions, and current and deferred income tax expense."[17]  It noted that it had conducted "significant incremental work" through 2011 and early 2012 as a result of this "continued material weakness" and that this work would result in approximately $250 million in adjustments.[18]  The company stated that it "believe[d]" that this review was "comprehensive" and "thorough."[19]

On a conference call that same day, Becnel stated that the Company's "'international tax structure . . . is a good structure'" but conceded the Company's "'lack of understanding and fully appreciating how that structure performs through different economic cycles, and the sensitivity of

---

[16]     CCAC ¶ 198.

[17]     Greenfield Decl., Ex. G.

[18]     *Id.*

[19]     *Id.*

our tax expense to how we manage certain costs in that structure, and how we document our tax positions.'"[20] Duroc-Danner stated that "'this is nothing more than the second of the last chapter of the dismal event of last February [2011], except that this one is a studious chapter, if you will, one that has gone through the possible understanding of what we have . . . we're reporting things that were wrong, but from a position of knowledge.'"[21]

On March 15, 2012, the Company issued its Second Restatement as part of its 10-K filing.  It increased its previously stated tax expense for 2011 by $118 million, for 2010 by $41 million, for 2009 by $50 million, and for 2008 and prior years by $165 million.[22]  The 10-K expanded also the risk disclosures regarding the material weakness.  In addition to the statements that had been included in the 2011 statements, this 10-K stated *inter alia*,

> "The existence of a material weakness in our internal control over financial reporting increases the risk that we will not be able to obtain the expected benefits of our tax structure. In the course of remediating the material weakness, we may find additional historical errors in our accounting for income taxes or discover new facts that cause us to reach different conclusions with respect to unrecognized tax benefits or otherwise change our existing opinion of these matters. This could result in increasing our tax expense for historical periods and reducing our net current and deferred tax assets, which could have an adverse effect on our financial results and our share price or our debt ratings."[23]

The 10-K noted also the risk that additional material weaknesses might be discovered in the future.

On March 23, 2012, the Company announced that Becnel and the Company's vice

---

[20]

  CCAC ¶ 67.

[21]

  *Id.* ¶ 68.

[22]

  *Id.* ¶¶ 72–73.

[23]

  Greenfield Decl., Ex. A at 21.

president of tax, James Hudgins, were leaving the Company.[24]

        D.      *Announcement of the Third Restatement*

        The Company issued its next 10-Q on May 8, 2012.  While that document did not contain any restatements, the Company in that quarter took $36 million in tax charges "related to prior periods."[25]

        On July 24, 2012, the Company announced that it would need to file a third restatement and again indicated that its previously issued financial statements should not be relied upon.[26]  It concluded that both the $36 million in charges noted in May and an additional $56 million in subsequently identified charges (for a total of $92 million) needed to be assessed against the prior years in restatements.[27]  The statement indicated that a significant portion of that restatement related to estimates regarding unrecognized tax benefits.[28]  This appears to have included $41 million relating to accruals for uncertain tax positions.[29]  The Company announced that it would not file any 10-Qs or 10-Ks until it had resolved these issues and announced its earnings for that quarter only

---

[24]

    *Id.* ¶ 78.

[25]

    *Id.* ¶ 80.

[26]

    *Id.* ¶ 82.

[27]

    *Id.* ¶ 83.

[28]

    *Id.* ¶ 82.

[29]

    *Id.* ¶ 83.

on a pre-tax basis.[30]  It indicated that it hoped to have that process completed by November 2012, but declined to provide any assurance that it would do so.[31]

On a July 25 conference call, new chief financial officer John Briscoe stated, "[W]hen we went through the restatement last year, we did learn a lot of things that are causing our rate to be higher.  Some of this is through some withholding taxes that, based on how things were structured and how things were being executed, it was triggering additional withholding taxes in [certain] jurisdictions."[32]  The third restatement had yet been issued by the time of the amended complaint's filing in this case in September 2012.

### E.    Procedural History

The complaint in this action was filed in March 2012, shortly after the second restatement.  It was amended in September 2012, after the announcement of the third restatement. The alleged Class Period is March 2, 2011 to July 24, 2012.  The amended complaint alleges that the first and second restatements, and the various other filings within the Class Period, were false and fraudulent.  Defendants have moved to dismiss, focusing principally on whether the amended complaint adequately alleges *scienter*.

---

[30]    *Id.* ¶ 84.

[31]    *Id.*

[32]    *Id.* ¶ 85.

*Discussion*

A.    *Legal Standard*

In deciding a motion to dismiss under Rule 12(b)(6), a court must accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor.[33]  In order to survive such a motion, the complaint  "'must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'"[34]  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[35]

To state a claim under Section 10(b) of the Exchange Act, a plaintiff must allege facts sufficient to "establish that the defendant, in connection with the purchase or sale of securities, made a materially false statement or omitted a material fact, with *scienter*, and that the plaintiff's reliance on the defendant's action caused injury to the plaintiff."[36]

A complaint asserting a Section 10(b) claim must satisfy also the heightened pleading standards of Rule 9(b) and the Private Securities Litigation Reform Act of 1995 ("PSLRA").[37]  A complaint must "state with particularity facts giving rise to a strong inference that the defendant

---

[33]

       *See Anschutz Corp. v. Merrill Lynch & Co.*, 690 F.3d 98, 107 (2d Cir. 2012).

[34]

       *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

[35]

       *Iqbal*, 556 U.S. at 678.

[36]

       *ECA & Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 197 (2d Cir. 2009) [hereinafter "*ECA*"] (internal quotation marks omitted).

[37]

       *See* Fed. R. Civ. P. 9(b); 15 U.S.C. § 78u–4(b).

acted with the requisite state of mind."[38]  Allegations of recklessness – "an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it" – are sufficient.[39]

In evaluating whether a complaint alleges facts giving rise to a "strong inference of *scienter*," courts must consider all the facts alleged, inferences favoring plaintiffs rationally drawn from the facts, and "plausible, nonculpable explanations for the defendant's conduct."[40]  The "inference of *scienter* must be 'more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent.'"[41]  Generally, the plaintiffs must allege facts sufficient to show that each defendant "personally knew of, or participated in, the fraud."[42]  That is, the plaintiff must allege that each defendant had the requisite *scienter*.[43]

A complaint may satisfy the *scienter* requirement "by alleging facts to show either (1) that defendants had the motive and opportunity to commit the fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness."[44]  A complaint alleges strong circumstantial

---

[38]

   15 U.S.C. § 78u–4(b)(2)(A); *accord Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007).

[39]

   *ECA*, 553 F.3d at 198 (internal quotation marks and alterations omitted).

[40]

   *Tellabs*, 551 U.S. at 324.

[41]

   *ECA*, 553 F.3d at 198 (quoting *Tellabs*, 551 U.S. at 314).

[42]

   *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993) (emphasis omitted).

[43]

   *See In re BISYS Sec. Litig.*, 397 F. Supp. 2d 430, 440 (S.D.N.Y. 2005) [hereinafter "*BISYS*"].

[44]

   *ECA*, 553 F.3d at 198.

evidence of *scienter* when it alleges facts that, if true, would show that defendants (1) "benefitted in a concrete and personal way from the purported fraud," (2) "engaged in deliberately illegal behavior," (3) "knew facts or had access to information suggesting that their public statements were not accurate," or (4) "failed to check information they had a duty to monitor."[45]

B.    *Plaintiffs Plead* Scienter *Adequately*

Defendants move to dismiss the complaint.  They contend that the most compelling inference from its allegations is the nonculpable one: defendants filed financial statements in the honest and at most negligent belief in their accuracy, only to learn repeatedly that their confidence in the accuracy of the statements was unwarranted.

The Court cannot conclude as a matter of law that this inference is more compelling than the inference advanced by plaintiffs—that defendants filed financial statements in reckless disregard of a high risk of their inaccuracy.[46]  At the time of the first restatement, defendants were aware not only of the $500 million error, but also that the Company had a complicated tax structure and that its  internal controls for tax accounting—in areas that went well beyond the cause of the $500 million error—were essentially non-existent.  Nevertheless, defendants filed new financial statements, expressing particular awareness of the importance of filing in time to avoid a debt default.[47]  The Company continued to tout the benefits of its tax structure and specifically disclosed

---

[45]

     *Id.* at 199; *Novak v. Kasaks*, 216 F.3d 300, 311 (2d Cir. 2000); *see Teamsters Local 445 Freight Division Pension Fund v. Dynex Capital, Inc.*, 531 F.3d 190, 194 (2d Cir. 2008).

[46]

     The Court relies only on circumstantial evidence of recklessness.  It need not address plaintiffs' attempts to allege *scienter* through motive and opportunity.

[47]

     In relying on the weakness of the Company's internal controls to find that *scienter* has been alleged, the Court in no way departs from its holding in *Dobina* that the weak internal

in October 2011 that it had performed additional reconciliations and post-closing procedures to ensure that its financial statements complied with GAAP.  But just four months later, in February 2012, the Company announced that those same financials would need to be restated by another $250 million.  In light of the presumably intense, high-level focus on tax accounting following the first restatement and the reconciliations that purportedly occurred to ensure accuracy notwithstanding the weak controls, the magnitude of the error is further supportive of defendants' *scienter* with respect to their prior statements.[48]

Defendants argue that the cause of these errors was unrelated to the cause of the $500 million error.  They concede, however, that the errors related to "deferred tax accounts, reserves for uncertain tax positions, [and] accrual of withholding taxes."[49]  These were areas in which the Company specifically identified serious internal controls problems in the first restatement.[50]  Indeed, Duroc-Danner himself said that the second restatement was "nothing more than the second of the

---

controls there provided little support for the inference that the understatement of tax expense was made with *scienter*.  909 F. Supp. 2d at 249–50 (noting that "weak internal controls may pave the way for fraud.  They do not themselves constitute fraud." (internal quotation marks omitted)).

Whether weak internal controls are relevant to *scienter* analysis depends on how much defendants knew about those weaknesses.  In *Dobina*, there were no allegations that the weaknesses in internal controls of which defendants were aware had anything to do with the understatement of tax expense.  By contrast, here defendants allegedly knew about deep problems pervading their internal controls that would contribute to their alleged awareness of a high risk of potential error in precisely the areas that proved problematic.

[48]

In *Dobina*, this Court explained that whether the magnitude of an error is relevant to *scienter* depends heavily on the circumstances.  *See Dobina*, 909 F. Supp. 2d at 250 n.106.

[49]

Mot. Dismiss 16.

[50]

Greenfield Decl., Ex. B.

last chapter of the dismal event of last February [2011]."[51]  Moreover, Duroc-Danner stated that the difference is that the second restatement "is a studious chapter, if you will, one that has gone through the possible understanding of what we have . . . we're reporting things that were wrong, but from a position of knowledge.'"[52]  While other inferences may be plausible as well, one may infer from this remark and the admissions of the first restatement that the Company was aware that it was not in a "position of knowledge" when it filed its earlier financial statements.

Defendants had been aware since the first restatement that the Company's tax accounting had led to a $500 million error and that it had pervasively inadequate internal controls. By February 2012, however, they were further aware that the purported reconciliations and additional checks that were conducted after the first restatement and in October 2011 to compensate for the lack of controls had proved insufficient to avoid even another $250 million error. Nevertheless, defendants proceeded again to issue restated financials.[53]  Again, in light of the presumable high-level focus on the relevant issues and the awareness of multiple significant restatements, the magnitude of the third restatement of another $100 million further supports an inference of recklessness.  Moreover, that the Company under a new chief financial officer for the first time chose to wait months before filing revised financials may support an inference that Becnel was responsible for the reckless strategy with respect to the prior restatements.

---

[51]  CCAC ¶ 68.  The close relationship Duroc-Danner concedes distinguishes this case from *In re Stonepath Grp., Inc. Sec. Litig.*, 397 F. Supp. 2d 575, 588 (E.D. Pa. 2005).

[52]  CCAC ¶ 68.

[53]  Defendants point here to their disclosure that they may identify further errors requiring future restatements so long as the material weakness remains unremediated.  But such a disclosure cannot insulate defendants from liability for their statement of confidence in the financial results that it did set forth.

15

In all these circumstances, the inference that defendants issued financial statements in reckless disregard for their truth is at least as compelling as the inference that defendants repeatedly just got the results wrong.  Moreover, in light of the specific statements each made and the allegations of their close involvement with addressing the Company's tax problems, the Court concludes that the complaint is sufficient as to both Becnel and Duroc-Danner.

*Conclusion*

Accordingly, defendants' motion to dismiss is denied.

SO ORDERED.

Dated:          September 19, 2013

_____
Lewis A. Kaplan
United States District Judge

(The manuscript signature above is not an image of the signature on the original document in the Court file.)